**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BONITA SHREVE;<br>GUN OWNERS OF AMERICA, INC.; and<br>GUN OWNERS FOUNDATION,<br><br>    *Plaintiffs*,<br><br>    v.<br><br>UNITED STATES POSTAL SERVICE;<br>DOUG TULINO, in his Official Capacity as U.S.<br>POSTMASTER GENERAL; U.S. POSTAL<br>INSPECTION SERVICE; GARY BARKSDALE,<br>in his Official Capacity as CHIEF POSTAL<br>INSPECTOR; and U.S. DEPARTMENT OF<br>JUSTICE,<br><br>    *Defendants*. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil No.: _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

COME NOW Plaintiffs Bonita Shreve, Gun Owners of America, Inc., and Gun Owners Foundation, by and through undersigned counsel, and allege as follows:

## INTRODUCTION

1. This case involves a Second Amendment challenge to 18 U.S.C. § 1715, the nation's first federal gun control law. Dating only to 1927, this Prohibition-era firearm regulation prohibits ordinary Americans from mailing handguns using the U.S. Postal Service, even for perfectly lawful purposes. But this vestigial regulation has outlived its Prohibition-era roots, having been enacted during a time with no other federal controls on the interstate sale or shipment of firearms on the books. And more importantly, it fails to comport with the original public understanding of the Second Amendment, which accommodated no federal controls on the domestic mailing of firearms

1

at the time of the Founding.  Section 1715 should be declared unconstitutional, and its continued enforcement enjoined.

2.   In *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 33 (2022), the Supreme Court held that the Second Amendment "guarantees … a right to 'bear' arms in public for self-defense."  And in *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008), the Court explained that this right "is exercised individually and belongs to all Americans."   Further, the Court acknowledged that "handguns are the most popular weapon chosen by Americans for self-defense," and that a complete ban on their possession is unconstitutional.  *Id*. at 628-29.

3.   As *Bruen* explained further, the Second and Fourteenth Amendments together guarantee individual Americans not only the right to "keep" firearms in their homes, but also the right to "bear arms," meaning "to carry a handgun for self-defense outside the home," free from infringement by either federal or state governments.  *Bruen*, 597 U.S. at 10.

4.   *Heller* and *Bruen* also laid out a textual and historical approach for analyzing Second Amendment challenges.  As the Court explained in *Bruen*, "[o]nly if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"  *Bruen*, 597 U.S. at 17.

5.   And in the Supreme Court's most recent pronouncement on the Second Amendment, the Court reaffirmed that textual and historical approach, instructing courts to determine "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *United States v. Rahimi*, 602 U.S. 680, 692 (2024).  To that end, courts must apply "faithfully the balance struck by the founding generation...."  *Id.*

6.   In blatant contravention of these principles, 18 U.S.C. § 1715 provides that, subject to certain limited exceptions not at issue here, "[p]istols, revolvers, and other firearms capable of

being concealed on the person are nonmailable and shall not be deposited in or carried by the mails or delivered by any officer or employee of the Postal Service."

7.   Violators of this general prohibition "shall be fined under this title or imprisoned not more than two years, or both."  18 U.S.C. § 1715.  Accordingly, a violation constitutes a Class E felony, punishable by fine of up to $250,000 for individuals.  *Id.* §§ 3559(a)(5), 3571(b)(3).

8.   In other words, it is a felony for ordinary Americans to use the mail to transport the "quintessential self-defense weapon" and "the most popular weapon chosen by Americans for self-defense in the home" and in public.  *Heller*, 554 U.S. at 629.

9.   The Mailing Standard of the United States Postal Service, Domestic Mail Manual ("DMM") is "incorporated by reference" into Part 111 of Title 39 of the Code of Federal Regulations.  *See* 39 C.F.R. § 111.1.

10. Likewise, U.S. Postal Service Publication 52 on "Hazardous, Restricted, and Perishable Mail" mirrors the statute's prohibition, adopting provisions on the nonmailability of handguns and other concealable weapons within the postal regulations.  *See* 39 C.F.R. § 211.2(a)(2).  If a violation of these regulations is discovered, Publication 52, § 435 provides that an offending firearm shipment "must be immediately reported to the Inspection Service in accordance with POM 139.117."

11. These prohibitions plainly violate the Second Amendment, and this case is easily resolvable under *Bruen*.  Indeed, the U.S. Postal Service traces its lineage to 1775, and it has existed through the Founding era and beyond.  But at no point did the Founders ever criminalize the mailing of handguns as the challenged statute does now.  Nor did the Reconstruction generation criminalize such conduct, which only confirms this Founding-era understanding.  And because "20th-century evidence … does not provide insight into the meaning of the Second Amendment

when it contradicts earlier evidence," *Bruen*, 597 U.S. at 66 n.28, this 1927 law simply cannot stand on its own.

12. Because the federal ban on the mailing of handguns is inconsistent with Founding-era historical tradition, it violates the Second Amendment.

13. Plaintiffs therefore request permanent injunctive relief, as well as declaratory and other relief, to rectify and prevent further violation of their rights.

## PARTIES

14. Bonita Shreve ("Shreve") is a natural person and a citizen of the United States and of the Commonwealth of Pennsylvania, residing in Blair County, Pennsylvania.  Shreve is a member of Plaintiff Gun Owners of America, Inc.  Shreve is a law-abiding person over the age of 21 who is eligible to purchase and possess firearms under federal and Pennsylvania law.  Shreve does not hold a Federal Firearms License ("FFL"), nor is she engaged in the business of dealing in firearms as that term is defined under federal law.  *See* 18 U.S.C. § 921.

15. Shreve has spoken with her father, who lives in Lebanon County, in eastern Pennsylvania. Shreve desires to transfer to her father a Bersa Thunder handgun as a gift as soon as she acquires the replacement handgun she desires, a purchase she intends within the next three months.  Plaintiff Shreve's father is a law-abiding citizen and is not prohibited by either federal or state law from purchasing or possessing a firearm.  And like Plaintiff, Plaintiff Shreve's father does not hold an FFL and is not engaged in the firearms business.

16. Plaintiff's intended gift of a firearm comports with state law.  Plaintiff Shreve's handgun qualifies as a "firearm" under the Pennsylvania Uniform Firearms Act, being "[a]ny pistol or revolver with a barrel length less than 15 inches."  18 Pa.C.S. § 6102.  However, Shreve need not transfer this firearm to her father "upon the place of business of a licensed importer, manufacturer,

dealer or county sheriff's office," subject to the background check procedures otherwise required by law. *Id.* § 6111. Rather, Section 6111(c) provides that Shreve may transfer this firearm to her family member privately, something that is also lawful under federal law.[1]

17. However, because Plaintiff Shreve's father lives approximately three hours away if she were to drive, and because Shreve has no intentions of making such a long drive in the foreseeable future, Shreve wishes to ship the handgun to her father directly to his home in eastern Pennsylvania. However, Shreve understands that, by virtue of being an ordinary person without an FFL, the shipping policies of private common carriers such as UPS and FedEx prevent her from shipping the handgun using those services. Thus, Shreve's only remaining shipping option would be to use the U.S. Postal Service. But for Defendants' enforcement of 18 U.S.C. § 1715 and Publication 52, which generally prohibit the mailing of handguns, Shreve would immediately use the U.S. Postal Service to mail the handgun to her father within the next 90 days. *See* Declaration of Bonita Shreve, Exhibit 1.

18. Neither Shreve nor her father falls within the challenged statute's limited exceptions. Neither is an "officer[] of the Army, Navy, Air Force, Coast Guard, Marine Corps, Space Force, or Organized Reserve Corps," an "officer[] of the National Guard or Militia of a State, Territory, Commonwealth, Possession, or District," an "officer[] of the United States or of a State, Territory, Commonwealth, Possession, or District whose official duty is to serve warrants of arrest or commitments," an "employee[] of the Postal Service," an "officer[] [or] employee[] of enforcement agencies of the United States," a "watchm[a]n engaged in guarding the property of the United States, a State, Territory, Commonwealth, Possession, or District," or a "manufacturer[]

---

[1] *To Whom May an Unlicensed Person Transfer Firearms Under the GCA?*, ATF, https://www.atf.gov/firearms/qa/whom-may-unlicensed-person-transfer-firearms-under-gca (last visited July 11, 2025).

of firearms or bona fide dealer[].ˮ  18 U.S.C. § 1715.  *See* Declaration of Bonita Shreve, Exhibit 1.

19. Plaintiff Gun Owners of America, Inc. (ʺGOAʺ) is a California non-stock corporation with its principal place of business in Springfield, Virginia.  GOA is organized and operated as a nonprofit membership organization that is exempt from federal income taxes under Section 501(c)(4) of the U.S. Internal Revenue Code.  GOA was formed in 1976 to preserve and defend the Second Amendment rights of gun owners.  GOA has more than 2 million members and supporters across the country, including tens of thousands within Pennsylvania, many of whom reside within this district.  Like Shreve, some of these members and supporters also wish to use the U.S. Postal Service to mail their lawfully owned handguns and other concealable weapons for private, lawful purposes, such as for interstate travel or for intrastate, familial transfers in accordance with Pennsylvania law.  *See* 18 Pa.C.S. § 6111(c).  Many of these members and supporters do not meet any of the statute's limited exceptions, and would mail these weapons but for Defendants' enforcement of 18 U.S.C. § 1715 and Publication 52.  *See* Declaration of Val W. Finnell, Exhibit 2.

20. Plaintiff Gun Owners Foundation (ʺGOFʺ) is a Virginia non-stock corporation with its principal place of business in Springfield, Virginia.  GOF was formed in 1983 and is organized and operated as a nonprofit legal defense and educational foundation that is exempt from federal income taxes under Section 501(c)(3) of the U.S. Internal Revenue Code.  GOF is supported by gun owners across the country, including residents of Pennsylvania, who fund the organization's activities so that it can, *inter alia*, file litigation such as this to preserve, protect, and defend their Second Amendment rights.  Although not a ʺtraditionalʺ membership organization, courts have found GOF to possess ʺindicia of membershipʺ under *Hunt v. Wash. State Apple Advert. Comm'n*,

432 U.S. 333 (1977), for purposes of representing its supporters' interests in litigation. *See, e.g.*, *Texas v. BATFE*, 737 F. Supp. 3d 426, 438 (N.D. Tex. 2024). Some of GOF's supporters wish to use the U.S. Postal Service to mail their lawfully owned handguns and other concealable weapons for private, lawful purposes, such as for interstate travel or for intrastate, familial transfers in accordance with Pennsylvania law. *See* 18 Pa.C.S. § 6111(c). These supporters do not meet any of the statute's limited exceptions, and they would mail these weapons but for Defendants' enforcement of 18 U.S.C. § 1715 and Publication 52. *See* Declaration of Val W. Finnell, Exhibit 2.

21. Defendant U.S. Postal Service ("USPS") is an executive agency within the federal government of the United States. USPS is headquartered at 475 L'Enfant Plaza SW, Washington, D.C. 20260. USPS is the agency responsible for "investigat[ing] postal offenses … relating to the Postal Service," including the general prohibition on the mailing of handguns challenged here. 39 U.S.C. § 404(a)(6). To that end, "Postal Inspectors and other agents of the United States Postal Service" have the authority to enforce "laws regarding property in the custody of the Postal Service, property of the Postal Service, the use of the mails, and other postal offenses." 18 U.S.C. §§ 3061(a), (b)(1).

22. Defendant Doug Tulino is the Acting Postmaster General of the United States and is responsible for overseeing USPS's enforcement of the general prohibition on the mailing of handguns challenged here. 39 U.S.C. § 203; 39 C.F.R. § 222.1(a). He is sued in his official capacity.

23. Defendant U.S. Postal Inspection Service ("USPIS") is the "primary law enforcement arm"[2] of USPS. USPIS is headquartered at 475 L'Enfant Plaza SW, Washington, D.C. 20260. USPIS is responsible for "the enforcement of laws regarding property in the custody of the Postal Service, property of the Postal Service, the use of the mails, and other postal offenses." 18 U.S.C. § 3061(b)(1); *see also* 39 C.F.R. § 233.1.

24. Defendant Gary Barksdale is the Chief Postal Inspector of USPIS and is responsible for overseeing its operations, including the enforcement of the general prohibition on the mailing of handguns challenged here. *See* 39 U.S.C. § 204; 39 C.F.R. §§ 4.5, 230.1, 233.1. He is sued in his official capacity.

25. Defendant U.S. Department of Justice ("DOJ") is an executive department within the federal government of the United States. DOJ is headquartered at 950 Pennsylvania Avenue NW, Washington, D.C. 20530. DOJ is the agency responsible for enforcing federal criminal laws, including the general prohibition on the mailing of handguns challenged here. *See* 28 U.S.C. § 533.

26. Defendants have not disclaimed criminal enforcement of 18 U.S.C. § 1715 and Publication 52. To the contrary, Defendants continue to enforce the statute and their regulations nationwide, and if Plaintiffs were to mail handguns in violation of federal law, it is likely that Defendants would prosecute Plaintiffs for it. *See, e.g.*, *United States v. France*, 2022 U.S. Dist. LEXIS 150896 (N.D. Ga. June 24, 2022); *United States v. Bernal-Salinas*, 2022 U.S. Dist. LEXIS 160499 (E.D.N.C. Sept. 6, 2022); *United States v. Perez*, 2025 U.S. Dist. LEXIS 41420 (D. Conn. Mar. 7, 2025).

---

[2] *Leadership*, U.S. Postal Inspection Serv., https://www.uspis.gov/leadership (last visited July 9, 2025).

## JURISDICTION AND VENUE

27. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 39 U.S.C. § 409.  This Court has authority to grant the remedy Plaintiffs seek pursuant to 28 U.S.C. §§ 2201 and 2202.

28. Venue in this district is proper because Defendants are officers and agencies of the United States, no real property is involved in this action, and Plaintiff Shreve resides in this judicial district.  28 U.S.C. § 1391(e)(1).

## STANDING

### Plaintiff Shreve's Standing

29. Plaintiff Shreve has suffered (1) an "injury in fact" that is (2) "fairly traceable to the challenged action of the defendant[s]" and is (3) "likely, as opposed to merely speculative, that the alleged injury will be redressed by a favorable decision."  *Finkelman v. NFL*, 877 F.3d 504, 510, 511 (3d Cir. 2017).  Traceability and redressability are "closely related" and typically "overlap" when a plaintiff challenges government action.  *Toll Bros., Inc. v. Township of Readington*, 555 F.3d 131, 143 (3d Cir. 2009).

30. Shreve wishes to mail a handgun using the U.S. Postal Service.  She would do so within the next 90 days, but for 18 U.S.C. § 1715 and Publication 52, which criminalize and prohibit such conduct and which Defendants enforce.  Accordingly, a favorable judicial decision declaring this statute unconstitutional and enjoining Defendants from enforcing it would redress Shreve's injury.

### The Organizational Plaintiffs' Standing

31. Plaintiff GOA has associational standing to bring suit on behalf of its members because "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the

relief requested requires the participation of individual members in the lawsuit." *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 365 (3d Cir. 2015).

32. First, at least one of Plaintiff GOA's members, Shreve, has standing to sue in her own right.

33. Second, challenging the enforcement of an unconstitutional firearm regulation is relevant to Plaintiff GOA's organizational purpose of preserving and defending the Second Amendment rights of gun owners.

34. Third, neither the claims asserted nor the relief requested requires the participation of individual members of Plaintiff GOA, because Plaintiffs "seek[] a declaration, injunction, or some other form of prospective relief" which "if granted, will inure to the benefit of those members." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

35. Plaintiff GOF additionally bears indicia of membership sufficient to confer associational standing. *See, e.g.*, *Texas v. BATFE*, 737 F. Supp. 3d 426, 438 (N.D. Tex. 2024) ("The foregoing, together, suffice for GOF's associational standing."). GOF is a nonprofit legal defense and educational foundation that is supported by gun owners across the country, including in Pennsylvania. GOF receives all its funding from its supporters, who voluntarily fund its activities. GOF litigates cases throughout the country on behalf of its supporters. GOF's supporters receive information about its activities through a quarterly newsletter and regular emails about its activities. And GOF's supporters regularly communicate their views to GOF about issues on which GOF should focus.

**Plaintiffs' Pre-Enforcement Challenge**

36. Plaintiffs have standing to levy a pre-enforcement challenge to 18 U.S.C. § 1715 and Publication 52 because courts "do not force people seeking to exercise their constitutional rights to wait until they are prosecuted criminally." *NSSF v. Att'y Gen. of N.J.*, 80 F.4th 215, 219 (3d Cir.

2023); *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007) ("[W]here threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit...."). In other words, a "plaintiff need not 'first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute'" when "fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative," even if a "criminal penalty provision has not yet been applied...." *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 302 (1979); *see also id.* at 303 (standing lies when statute "authorizes imposition of criminal sanctions against" violators). Thus, "Damocles's sword does not have to actually fall … before the court will issue an injunction." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

37. Plaintiffs "(1) intend to take action that is (2) 'arguably affected with a constitutional interest' but is (3) arguably forbidden by the Law, and (4) the threat of enforcement against them is substantial." *NSSF*, 80 F.4th at 219.

38. Plaintiffs intend to mail handguns and other concealable weapons using the U.S. Postal Service. This firearm-related conduct is "arguably affected with a constitutional interest" – that is, the Second Amendment right to keep and bear arms. The challenged statute prohibits such conduct, and Defendants actively enforce the challenged statute nationwide. *See, e.g.*, *United States v. France*, 2022 U.S. Dist. LEXIS 150896 (N.D. Ga. June 24, 2022); *United States v. Bernal-Salinas*, 2022 U.S. Dist. LEXIS 160499 (E.D.N.C. Sept. 6, 2022); *United States v. Perez*, 2025 U.S. Dist. LEXIS 41420 (D. Conn. Mar. 7, 2025).

## STATEMENT OF FACTS

**A. The Vestigial Federal Prohibition on the Mailing of Handguns.**

39. Since 1927, federal law has generally prohibited the mailing of handguns using the U.S. Postal Service.[3]  The relevant statute, 18 U.S.C. § 1715, currently provides:

> Pistols, revolvers, and other firearms capable of being concealed on the person are nonmailable and shall not be deposited in or carried by the mails or delivered by any officer or employee of the Postal Service.

40. Notably, FFLs are exempt from the statute's prohibition.  Thus, Defendant USPS currently handles untold numbers of handguns and other concealable weapons throughout its shipping network on behalf of commercial shippers.  Only ordinary Americans are excluded from this service – although they curiously remain free to ship long guns like rifles and shotguns.[4]

41. At the time of the statute's Prohibition-era enactment, the nation was experiencing a perceived "crime wave," often exaggerated by newspaper reporting.  *See* Lee Kennett & James LaVerne Anderson, The Gun in America: The Origins of a National Dilemma 188 (Jon L. Wakelyn ed., Contributions in Am. Hist. Ser. No. 37, paperback ed. 1976).  Of particular concern to legislators was the easily concealed handgun, which proliferated from print-advertised "mail-order houses"[5] and quickly became not only a favored tool of self-defense, but also an implement of crime.  *Id.* at 194.  As one Detroit police chief lamented in 1924, "mail-order firms alone supplied

---

[3] Act of Feb. 8, 1927, Pub. L. No. 69-583, 44 Stat. 1059 (codified as amended at 18 U.S.C. § 1715).

[4] But for the challenged statute's disparate treatment of Plaintiffs, federal law would prohibit Defendants from "mak[ing] any undue or unreasonable discrimination among users of the mails" or "grant[ing] any undue or unreasonable preferences to any such user," such as allowing federal firearms dealers to ship firearms, but prohibiting Plaintiffs from engaging in the same conduct.  39 U.S.C. § 403(c).

[5] *See, e.g.*, Sears, Roebuck & Co. Catalogue No. 111, at 320 (1902), https://archive.org/details/sears-roebuck-catalogue-111/page/n173/mode/2up.

5,000 pistols a year to inhabitants of his city," who he maligned as "dope addicts, feeble minded citizens, beer-runners, stick-up men, and gentlemen full of moonshine." *Id.* at 190-91.

42. Bolstered by these sorts of social attitudes and anti-gun media sensationalism, Members of Congress began to contemplate legislation to curb the American citizen's ready access to the right to keep and bear arms. As one Representative from Washington stated during House debates in 1924:

> [t]his bill … forbidding the shipment of firearms that are capable of being concealed on the person through interstate carriers, it is hoped will minimize the prevalence of firearms in the hands of the undesirable criminal element of the country. … Every criminal, of course, carries concealed weapons. … [A]nd when a policeman or officer of the law gets after and pursues them the first thing they do is to get rid of their firearms, and then they just simply get one through the mail-order house.... This is to stop their replenishing themselves from the mail angle.... [66 Cong. Rec. 726 (daily ed. Dec. 17, 1924) (statement of Rep. Miller).[6]]

43. Opponents of the so-called "Miller Bill" that would become 18 U.S.C. § 1715 explained that the scope of the Second Amendment right should not vary in accordance with the crime rate. The "most vehement opponent of the Miller Bill was Congressman Thomas Blanton of Texas. It would not work, he insisted, since the criminal would get a gun in spite of any law." Kennett & Anderson, *supra*, at 200. Moreover, as Representative Blanton warned:

> here is what this law would result in: You allow the dealers under this law to transport firearms and revolvers through the mails; you let officers transport revolvers through the mails, and you let everybody else except the law-abiding individual himself to do it, and here is what you are going to have: In certain parts of the State of New York, in West Virginia, in Alabama, in Tennessee, in Texas, and in the State of Washington there will be certain cities where there will be only one dealer accessible, and when a citizen wants to buy a revolver, even though he conforms to the regulations of the State laws, he is at the mercy of that one dealer, and he will have to pay not $20 for a good revolver, or $25, but he will have to pay $50 or $75 or $100 for it, and it will be beyond his reach financially, and we will be depriving a citizen of a right.... [66 Cong. Rec. 728 (daily ed. Dec. 17, 1924) (statement of Rep. Blanton).]

---

[6] https://www.congress.gov/bound-congressional-record/1924/12/17/house-section.

44. Ultimately, the concerns of rural and law-abiding citizens were ignored, and the Miller Bill "was eventually passed by the Senate and signed into law in 1927[,] … effectively clos[ing] the mails to the pistol."  Kennett & Anderson, *supra*, at 201.

45. Of course, the statute did little – if anything – to curb violent crime.  Yet purported prevention of crime became a common refrain for subsequent federal enactments restricting firearms, from the National Firearms Act of 1934, to the Federal Firearms Act of 1938, and once again to the Gun Control Act of 1968.  *See generally* Kennett & Anderson, *supra*.

46. But at the time of the statute's 1927 enactment, no other federal firearms restrictions existed.  That is no longer the case, as the subsequent Gun Control Act and Brady Handgun Violence Prevention Act enacted a pervasive scheme of interstate shipment, transportation, and background verification controls.  *See* 18 U.S.C. § 922.  Thus, to the extent the Miller Bill's original policy justification had any validity then, or any relevance under *Bruen* now (it does not), the subsequent enactment of additional federal controls has rendered 18 U.S.C. § 1715 obsolete.

47. Yet today, ordinary Americans still are effectively barred from shipping their handguns for private, noncommercial, lawful purposes, even though the U.S. Mail remains available for the shipment of long guns.  Indeed, ordinary Americans have no other option available to ship handguns, as private common carriers have prohibited the practice for several years.[7]

48. Recognizing this impossibility, Members of Congress recently have introduced legislation to repeal 18 U.S.C. § 1715 entirely and prohibit Defendant Postmaster General from promulgating

---

[7] *See, e.g.*, *How to Ship Firearms*, UPS, https://www.ups.com/us/en/support/shipping-support/shipping-special-care-regulated-items/prohibited-items/firearms (last visited July 9, 2025); *How to Ship Firearms*, FedEx, https://www.fedex.com/en-us/shipping/how-to-ship-firearms.html (last visited July 9, 2025).

rules restricting the mailing of firearms.  *See* Protecting the Mailing of Firearms Act, H.R. 3033, 119th Cong. (2025).[8]

**B.  Current Postal Regulations.**

49. Pursuant to 18 U.S.C. § 1715, Defendant USPS has promulgated regulations governing the shipment of firearms in Postal Service Publication 52.[9]

50. For instance, postal regulations provide that "[p]istols, revolvers, and other firearms capable of being concealed on the person (for example, short-barreled shotguns and short-barreled rifles) are defined as handguns."  Publication 52, *supra*, § 431.2.

51. Moreover, "[h]andguns and other firearms capable of being concealed on the person are nonmailable unless mailed between" parties as listed in the regulations, and only after the filing of an affidavit as required by the regulation.  Publication 52, *supra*, § 432.2.

52. The regulations then provide that "handguns may be mailed by a licensed manufacturer of firearms, a licensed dealer of firearms, a licensed importer of firearms," or various "authorized" agents of federal or state governments, upon "filing the required affidavit or certificate." Publication 52, *supra*, § 432.21.

53. However, neither federal law nor the postal regulations prohibit the mailing of "unloaded rifles or shotguns," and so ordinary Americans remain free to mail long guns using the Postal Service.  Publication 52, *supra*, § 432.3.

---

[8] https://www.congress.gov/bill/119th-congress/house-bill/3033/text.
[9] *See* 39 C.F.R. § 211.2(a)(2) ("The regulations of the Postal Service consist of …" the Domestic Mail Manual … and "Publication 52").  *See also Firearms*, USPS Postal Explorer, https://pe.usps.com/text/pub52/pub52c4_008.htm (last visited July 9, 2025) (hereinafter "Publication 52").

**C. The Second Amendment.**

**1. Methodology.**

54. The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

55. In its landmark 2008 decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court rejected the nearly uniform opinions reached by the courts of appeals, which for years had claimed that the Second Amendment protects only a communal right of a state to maintain an organized militia. *Id.* at 581. Setting the record straight, the *Heller* Court explained that the Second Amendment recognizes, enumerates, and guarantees to *individuals* the preexisting right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *Id.* at 592.

56. Then, in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court explained that the Second Amendment is fully applicable to the states through operation of the Fourteenth Amendment. *Id.* at 791.

57. Next, in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), the Court reaffirmed its conclusion in *Heller* that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," and that this "Second Amendment right is fully applicable to the States." *Id.* at 411.

58. As the Supreme Court explained in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the Second and Fourteenth Amendments together guarantee individual Americans not only the right to "keep" firearms in their homes, but also the right to "bear arms," meaning "to carry a

handgun for self-defense outside the home," free from infringement by either federal or state governments. *Id.* at 10.

59. Finally, the Supreme Court's latest pronouncement on the Second Amendment reaffirms the textual and historical framework from *Heller* and *Bruen*. *See United States v. Rahimi*, 602 U.S. 680, 692 (2024) (explaining that *Bruen* reiterates "the appropriate analysis"); *see also id.* at 714 (Gorsuch, J., concurring) ("reinforc[ing] the focus on text, history, and tradition, following exactly the path we described in *Bruen*").

60. In addition to clearly recognizing the right of "'law-abiding, responsible citizens' … to public carry," *Bruen* also rejected outright the methodology used within this Circuit and other circuits to judge Second Amendment challenges. *Bruen*, 597 U.S. at 38 n.9.

61. Prior to *Bruen*, the Third Circuit had adopted a two-part test for analyzing Second Amendment cases: "First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. If it does not, our inquiry is complete. If it does, we evaluate the law under some form of means-end scrutiny." *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010) (citation omitted); *see also Bruen*, 597 U.S. at 22 n.4 (collecting cases using two-part test). Other circuit courts adopted and used a substantially similar formula, which invariably utilized the very same "judge-empowering 'interest-balancing inquiry'" that *Heller* had rejected. *See Heller*, 554 U.S. at 634; *see also Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1117 (S.D. Cal. 2017) ("the Ninth Circuit uses what might be called a tripartite binary test with a sliding scale and a reasonable fit"), *aff'd*, 742 F. App'x 218 (9th Cir. 2018).

62. Rejecting this widespread atextual, "judge-empowering" interest-balancing approach as "one step too many," *Bruen* directed (again) the federal courts to first principles: to assess the text of the Second Amendment, informed by the historical tradition. *Bruen*, 597 U.S. at 19, 22.

63. First, the Supreme Court "decline[d] to adopt that two-part approach" used in this and other circuits, and reiterated that, "[i]n keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17.

64. Second, the Supreme Court held that, "[t]o justify [a] regulation, the government may not simply posit that the regulation promotes an important interest.  Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.  Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"  *Bruen*, 597 U.S. at 17; *see also Rahimi*, 602 U.S. at 692 ("As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition.").

65. Third, in reviewing the historical evidence, the *Bruen* Court cabined review of relevant history to a narrow time period, because "not all history is created equal," focusing on the period around the ratification of the Second Amendment, and *perhaps* the Fourteenth Amendment, but only to the extent that it "mere[ly] confirm[s]" a Founding-era tradition.  *Bruen*, 597 U.S. at 37. Indeed, the Court noted that "post-ratification" interpretations "cannot overcome or alter th[e] text," and "we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."  *Id.* at 36, 37; *see also id.* at 37-60 (discussing the lack of relevant historical prohibitions on concealed carry in public).

66. In other words, according to the Second Amendment's text, and as elucidated by the Court in *Bruen*, if a member of "the people" wishes to "keep" or "bear" a protected "Arm," then the

ability to do so "shall not be infringed." It does not matter at all how important, significant, compelling, or overriding the government's interest is in infringing the right. Nor does it matter whether a government restriction "minimally" versus "severely" burdens (infringes) the Second Amendment. There are no relevant statistical studies to be consulted. There are no sociological arguments to be considered. The ubiquitous problems of crime or the density of population do not affect the equation. The only appropriate inquiry then, according to *Bruen*, is what the "public understanding of the right to keep and bear arms" was during the ratification of the Second Amendment in 1791. *Bruen*, 597 U.S. at 46-47.

67. Following the Supreme Court's instruction, the Third Circuit has explained that "the constitutional right to keep and bear arms should be understood according to its public meaning in 1791," and that "laws enacted in the late-19th century" or later "'do not provide as much insight into' the original meaning of the right to keep and bear arms as do earlier sources." *Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 441 (3d Cir.), *reh'g en banc denied*, 130 F.4th 65 (3d Cir. 2025).

68. In addition to providing the proper time focus for historical review, the Supreme Court also has instructed as to the scope of the protected persons, conduct, and arms covered by the Second Amendment.

69. **First, the people.** *Heller* explained that, "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. *Heller* cited to *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990), which held that "'the people' … refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *See also Heller*, 554 U.S. at 581 (Second Amendment "is exercised individually and belongs to all Americans.").

70. Thus, as the Third Circuit recently explained, "[t]he Second Amendment's reference to 'the people' covers all adult Americans," and the term "cast[s] a wide net" to include even felons as a presumptive matter. *Lara*, 125 F.4th at 435, 436.

71. **Second, the protected conduct.** In its analysis, *Heller* turned to the "substance of the right: 'to keep and bear Arms.'" *Heller*, 554 U.S. at 581. The Court explained that "'[k]eep arms' was simply a common way of referring to possessing arms, for militiamen *and everyone else*." *Id.* at 583. Next, the Court instructed that the "natural meaning" of "bear arms" was "wear, bear, or carry … upon the person or in the clothing or in a pocket, for the purpose … of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id.* at 584. And "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Id. Bruen,* in fact, was more explicit, explaining that the "definition of 'bear' naturally encompasses public carry." *Bruen*, 597 U.S. at 32.

72. However, the Second Amendment's plain text does not cover *only* the literal 'keeping' and 'bearing' of arms. It also must cover ancillary acts like the acquisition, transportation, shipment, and receipt of firearms, because "[c]onstitutional rights … implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment); *see also Griswold v. Connecticut*, 381 U.S. 479, 482-83 (1965) ("The right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read … and freedom of inquiry, freedom of thought, and freedom to teach.... Without those peripheral rights the specific rights would be less secure."); *Bruen*, 597 U.S. at 70 ("The [Second Amendment] is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'").

73. Indeed, if the Second Amendment's plain text did not cover such ancillary acts as shipment or receipt, the government could ban these acts outright, crippling Americans' access to firearms. Accordingly, numerous courts have held these related acts to be presumptively protected by the Second Amendment's plain text:

> The Court recognized in *Bruen* that the conduct at issue there, possessing a firearm, was presumptively protected by the Amendment, so as to require the challenged law be justified based on "the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2130. The same is so of the conduct to which § 922(n) is addressed – shipping, receiving, or transporting a firearm – as the courts to consider that question have uniformly held. *See, e.g.*, *Holden*, 2022 U.S. Dist. LEXIS 212835, 2022 WL 17103509, at *3 ("Receiving a firearm is … presumptively protected by the Second Amendment"); *Stambaugh*, 2022 U.S. Dist. LEXIS 206016, 2022 WL 16936043, at *3 (felony indictees are part of "the people" in the Second Amendment and Second Amendment covers receipt of handgun); *Kelly*, 2022 U.S. Dist. LEXIS 215189, 2022 WL 17336578, at *2-3 (same); *Hicks*, 2023 WL 164170, at *2 (same); *Quiroz*, 2022 U.S. Dist. LEXIS 168329, 2022 WL 4352482, at *4 ("[D]oes the Second Amendment's plain text cover the conduct [of receiving a firearm]? Without a doubt the answer here is yes."). [*United States v. Rowson*, 652 F. Supp. 3d 436, 459 (S.D.N.Y. 2023).]

74. Thus, the Second Amendment protects a variety of ancillary acts as well, including purchase and acquisition of firearms, (*see Yukutake v. Lopez*, 2025 U.S. App. LEXIS 6017, at *2 (9th Cir. Mar. 14, 2025), *Sedita v. United States*, 2025 U.S. Dist. LEXIS 19753, at *22-23 (D.D.C. Feb. 4, 2025)), "transportation, sale, or transfer of firearms," (*see Lynchburg Range & Training, LLC v. Northam*, 2020 Va. Cir. LEXIS 57, *6 (Lynchburg Cir. Ct. 2020)), receipt of firearms, (*see United States v. Hicks*, 2023 U.S. Dist. LEXIS 35485, at *5 (W.D. Tex. Jan. 9, 2023), and training with firearms. *See Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011). In short, shipping and receiving protected arms is conduct protected by the Second Amendment.

75. **Third, the protected arms.** With respect to the term "Arms," the Court explained that such term includes "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another," and at the Founding, "all firearms constituted 'arms.'" *Heller*,

554 U.S. at 581.  Thus, because not only those items and activities in "existence in the 18th century are protected" by the Constitution, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," *id.* at 582, and "that general definition covers modern instruments that" so much as "*facilitate* armed self-defense."  *Bruen*, 597 U.S. at 28 (emphasis added); *see also Rahimi*, 602 U.S. at 691-92 ("As we explained in *Heller* … the reach of the Second Amendment is not limited only to those arms that were in existence at the founding. … Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers.").

76. There is no question as to handguns' presumptive (and in fact conclusive) protection under the Second Amendment.  Indeed, "the Second Amendment protects the possession and use of weapons that are 'in common use at the time,'" and there is no "dispute that handguns are weapons 'in common use' today for self-defense."  *Bruen*, 597 U.S. at 21, 32 (cleaned up).

77. At bottom, the Second Amendment's plain text presumptively applies to "all Americans," presumptively covers the shipment and receipt of firearms which is a prerequisite to "keep[ing] and bear[ing]," and presumptively extends to all "bearable arms."  Any "firearm regulation" (*Bruen*, 597 U.S. at 17) of those activities is presumptively unconstitutional, and Defendants bear the burden of showing their regulation comports with a broad and enduring historical tradition demonstrating that certain persons, activities, or arms were never considered within the scope of the Second Amendment in the first place.

78. Defendants cannot bear their heavy burden here.

### 2. The Challenged Statute Violates the Second Amendment.

79. The statute and Publication 52 (as incorporated by 39 C.F.R. § 211.2(a)(2)) prohibit Plaintiffs from lawfully mailing handguns to themselves or to others who are eligible to receive and possess them. *See* 18 U.S.C. § 1715.

80. Yet Plaintiffs undoubtedly are members of "the people" protected by the Second Amendment, being law-abiding adult American citizens. *See Lara*, 125 F.4th at 435.

81. Nor is there any "dispute that handguns are weapons 'in common use' today for self-defense" and are protected by the Second Amendment. *Bruen*, 597 U.S. at 32; *Heller*, 554 U.S. at 628.

82. Finally, the Second Amendment necessarily protects the right to ship, transfer, and receive firearms. *See, e.g.*, *Rowson*, 652 F. Supp. 3d at 459 (collecting cases).

83. Accordingly, Plaintiffs' "proposed course of conduct" – the shipment and receipt of handguns and other concealable weapons using the U.S. Mail – is "presumptively guarantee[d]" by the Second Amendment, and Defendants "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 32, 33, 17.

84. Defendants cannot meet their heavy burden because there is no historical tradition of prohibiting the mailing of handguns during the relevant analytical time period. Indeed, 18 U.S.C. § 1715 dates only to 1927, postdating the Founding era by well over a century.

85. With no relevant historical tradition to support its gun ban, the challenged statute and the provisions of Publication 52 restricting the mailing of firearms are unconstitutional.

**COUNT ONE**
**Violation of the Second Amendment**
**U.S. Const. amend. II**

86. All foregoing allegations are repeated and realleged as if fully set forth herein.

87. The challenged statute and Publication 52 infringe Plaintiffs' Second Amendment rights – rights that "shall not be infringed" – including the right to ship, transfer, and receive handguns and other concealable weapons.

88. Plaintiffs are or represent members of "the people" who wish to ship, transfer, and receive handguns and other concealable weapons using the U.S. Postal Service.  However, the challenged statute and Publication 52 infringe that right, prohibiting Plaintiffs (including members and supporters of GOA and GOF) from shipping, transferring, and receiving these firearms, even for lawful purposes like interstate or intrastate travel or even intrastate familial transfer.

89. Handguns are "unquestionably in common use today" and protected by the Second Amendment.  *Bruen*, 597 U.S. at 47.  Likewise, the Second Amendment presumptively protects "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."  *Heller*, 554 U.S. at 582.

90. Finally, the Second Amendment presumptively protects Plaintiffs' proposed course of of conduct, that being the shipment and receipt of handguns and other concealable weapons using the U.S. Mail.

91. And under *Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  To justify its regulation, the government may not simply posit that the regulation promotes an important interest.  Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."  *Bruen*, 597 U.S. at 17.  Thus, the burden is on Defendants to justify their firearm regulation according to Founding-era historical tradition.

92. Because Defendants will not be able to shoulder that burden, the 18 U.S.C. § 1715 and the provisions of Publication 52 restricting the mailing of firearms must be struck down as violative of the Second Amendment.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that relief be granted and judgment be entered in their favor and against Defendants as follows:

1.  An order permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the order, from enforcing 18 U.S.C. § 1715 and its implementing postal regulations;

2.  An order declaring that 18 U.S.C. § 1715 and its implementing postal regulations violate the Second Amendment;

3.  Attorneys' fees and costs pursuant to any statute or authority; and

4.  Such other further relief as is necessary to effectuate this Court's judgment or that this Court otherwise deems just and appropriate.


Dated: July 14, 2025

                                              Respectfully submitted,


*/s/ Gilbert J. Ambler*                       Stephen D. Stamboulieh
Gilbert J. Ambler (Pa. No. 326124)            MS Bar No. 102784
Ambler Law Offices, LLC                       Stamboulieh Law, PLLC
115 South Hanover Street, Suite 100           P.O. Box 428
Carlisle, PA 17013                            Olive Branch, MS  38654
(717) 525-5822                                (601) 852-3440
gilbert@amblerlawoffices.com                  stephen@sdslaw.us
                                              *\* Pro Hac Vice forthcoming*