**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BONITA SHREVE, *et al.* | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil No.: 3:25-cv-214-SLH |
| | ) | |
| UNITED STATES POSTAL SERVICE, *et al.* | ) | |
| | ) | |
| *Defendants*. | ) | |
| _____ | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION………………………………………………………………………...1

LEGAL STANDARD…………………………………………………………………...4

ARGUMENT…………………………………………………………………………...4

I.      PLAINTIFFS HAVE STANDING…………………………………………………...4

II.     THE CHALLENGED STATUTE AND REGULATIONS VIOLATE THE
        SECOND AMENDMENT……………………………………………………...9

  **A.**  The Vestigial Federal Prohibition on the Mailing of Handguns……………………………9

  B.  Current Postal Regulations……………………………………………………12

  C.  The Second Amendment………………………………………………………13

        1.  Methodology………………………………………………………………13

        2.  The Challenged Statute and Regulations Violate the Second Amendment………….21

        3.  Contrary to Supporting the Challenged statute, the Historical Tradition Supports
            Plaintiffs……………………………………………………………………...22

CONCLUSION…………………………………………………………………..23

## TABLE OF AUTHORITIES

**U.S. Constitution**
Fourteenth Amendment ........................................................................... 1, 13, 15
Second Amendment ........................................................................................ passim

**Cases**
*Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024) ............................................ 17
*Babbitt v. UFW Nat'l Union*, 442 U.S. 289 (1979) .............................................. 5
*Bd. of Educ. v. Pico*, 457 U.S. 853 (1982) ......................................................... 19
*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ................................................ 13
*D.J.S.-W. v. United States*, 962 F.3d 745 (3d Cir. 2020) ...................................... 4
*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................................... passim
*Duncan v. Becerra*, 265 F. Supp. 3d 1106 (S.D. Cal. 2017) ............................... 14
*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ...................................... 20
*FEC v. Ted Cruz for Senate*, 596 U.S. 289 (2022) .............................................. 11
*Griswold v. Connecticut*, 381 U.S. 479 (1965) .................................................. 19
*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977) ...................... 7
*Lara v. Comm'r Pa. State Police*, 125 F.4th 428 (3d Cir. 2025) ................ 4, 16, 17, 21
*League of Women Voters of the U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ........ 5
*Luis v. United States*, 578 U.S. 5 (2016) ...................................................... 2, 19
*Lynchburg Range & Training, LLC v. Northam*, 105 Va. Cir. 159 (Lynchburg 2020) .... 20
*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ........................................... 13
*MedImmune, Inc. v. Genentech, Inc.*, 549 U. S. 118 (2007) .................................. 5
*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) ........................ passim
*Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575 (3d Cir. 2003) ................... 4
*Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353 (3d Cir. 2015) ...................... 7
*Nguyen v. Bonta*, 140 F.4th 1237 (9th Cir. 2025) .............................................. 20
*NRA v. Bondi*, 133 F.4th 1108 (11th Cir. 2025) ................................................ 17
*Pipito v. Lower Bucks Cnty. Joint Mun. Auth.*, 822 F. App'x 161 (3d Cir. 2020) ......... 5
*Pitsilides v. Barr*, 128 F.4th 203 (3d Cir. 2025) .............................................. 2, 20
*Reese v. BATFE*, 127 F.4th 583 (5th Cir. 2025) ................................................ 16
*Sedita v. United States*, 763 F. Supp. 3d 63 (D.D.C. 2025) ................................. 20
*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ...................................................... 4
*Texas v. BATFE*, 737 F. Supp. 3d 426 (N.D. Tex. 2024) ...................................... 7
*Toll Bros., Inc. v. Township of Readington*, 555 F.3d 131 (3d Cir. 2009) ............. 5
*United States v. Adger*, 2023 U.S. Dist. LEXIS 77363 (S.D. Ga. May 3, 2023) ...... 20
*United States v. Bernal-Salinas*, 2022 U.S. Dist. LEXIS 160499 (E.D.N.C. Sept. 6, 2022) ...... 9
*United States v. France*, 2022 U.S. Dist. LEXIS 150896 (N.D. Ga. June 24, 2022) ..... 9
*United States v. Hicks*, 649 F. Supp. 3d 357 (W.D. Tex. 2023) ........................... 20
*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) ................................... 14
*United States v. Perez*, 2025 U.S. Dist. LEXIS 41420 (D. Conn. Mar. 7, 2025) ....... 9
*United States v. Quailes*, 126 F.4th 215 (3d Cir. 2025) ...................................... 16
*United States v. Rahimi*, 602 U.S. 680 (2024) ................................... 2, 14, 15, 18
*United States v. Rowson*, 652 F. Supp. 3d 436 (S.D.N.Y. 2023) ..................... 20, 22
*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) ................................. 17
*United States v. Williams*, 113 F.4th 637 (6th Cir. 2024) ................................... 16
*Worth v. Jacobson*, 108 F.4th 677 (8th Cir. 2024) ............................................. 16

ii

**Statutes**

18 Pa.C.S. § 6111(c) .................................................................................................. 6

18 U.S.C. § 1715 ............................................................................................... passim

18 U.S.C. § 3061(a) .................................................................................................. 8

18 U.S.C. § 3061(b)(1) ............................................................................................. 8

18 U.S.C. § 3559(a)(5) .......................................................................................... 3, 5

18 U.S.C. § 3571(b)(3) .......................................................................................... 3, 5

18 U.S.C. § 921 ........................................................................................................ 6

18 U.S.C. § 922 ............................................................................................. 6, 11, 20

18 U.S.C. § 926A ................................................................................................... 22

18 U.S.C. § 930 ..................................................................................................... 12

39 U.S.C. § 203 ....................................................................................................... 8

39 U.S.C. § 204 ....................................................................................................... 8

39 U.S.C. § 403(c) ................................................................................................... 9

39 U.S.C. § 404(a)(6) .............................................................................................. 8

**Other Authorities**

66 Cong. Rec. (daily ed. Dec. 17, 1924) ........................................................... 10, 11

Barrett Sharpnack, *Firepower by Mail: "Gun-Toting," State Regulation, and the Origins of Federal Firearms Legislation, 1911-1927*, Case W. Reserve Univ. (May 2015) ............. 22, 23

*Firearms*, USPS Postal Explorer ........................................................................... 12

*How to Ship Firearms*, FedEx ............................................................................... 12

*How to Ship Firearms*, UPS ................................................................................. 12

*Leadership*, U.S. Postal Inspection Serv. ............................................................... 8

Lee Kennett & James LaVerne Anderson, The Gun in America: The Origins of a National Dilemma (Jon L. Wakelyn ed., Contributions in Am. Hist. Ser. No. 37, paperback ed. 1976) . 9, 10, 11, 23

Montgomery Ward & Co.'s Catalogue No. 57 (1895) ............................................... 23

Protecting the Mailing of Firearms Act, H.R. 3033, 119th Cong. (2025) .................... 12

*Regulation*, Merriam Webster .............................................................................. 21

Sears, Roebuck & Co. Catalogue No. 104 (1897) .................................................... 23

Sears, Roebuck & Co. Catalogue No. 111 (1902) .................................................... 10

*U.S. Prohibited Commodities*, DHL ..................................................................... 12

**Regulations**

39 C.F.R. § 211.2(a)(2) ..................................................................................... 3, 12, 21

39 C.F.R. § 222.1(a) ................................................................................................ 8

39 C.F.R. § 230.1 .................................................................................................... 8

39 C.F.R. § 233.1 .................................................................................................... 8

39 C.F.R. § 233.1 .................................................................................................... 8

39 C.F.R. § 4.5 ........................................................................................................ 8

Fed. R. Civ. P. 56 .................................................................................................... 4

U.S. Postal Service Publication 52 .................................................................. passim

## INTRODUCTION

This case involves a Second Amendment challenge to 18 U.S.C. § 1715, believed to be the nation's first federal gun control law. Dating to only 1927, this Prohibition-era firearm regulation prohibits ordinary Americans from mailing handguns through the U.S. Postal Service, even for perfectly lawful purposes. This vestigial regulation has outlived its Prohibition-era roots, having been enacted during a time with no other federal controls on the interstate sale or shipment of firearms. But far more importantly, it fails to comport with the original public understanding of the Second Amendment, which accommodated no federal controls on the domestic shipment of firearms at the time of the Founding. Section 1715 should be declared unconstitutional, and its continued enforcement enjoined.

In *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 33 (2022), the Supreme Court held that the Second Amendment "guarantees … a right to 'bear' arms in public for self-defense." And in *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008), the Court explained that this right "is exercised individually and belongs to all Americans." Further, the Court acknowledged that "handguns are the most popular weapon chosen by Americans for self-defense," and that a complete ban on their possession is unconstitutional. *Id.* at 628-29.

As *Bruen* explained further, the Second and Fourteenth Amendments together guarantee individual Americans not only the right to "keep" firearms in their homes, but also the right to "bear arms" in public, meaning "to carry a handgun for self-defense outside the home," free from infringement by either federal or state governments. *Bruen*, 597 U.S. at 10. To that end, *Heller* and *Bruen* also laid out a textual and historical approach for analyzing *all* Second Amendment challenges. As the Court explained in *Bruen*, "[o]nly if a firearm regulation is consistent with this

Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, 597 U.S. at 17.

Finally, in the Supreme Court's most recent pronouncement on the Second Amendment, the Court reaffirmed this textual and historical approach, instructing courts to determine "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *United States v. Rahimi*, 602 U.S. 680, 692 (2024). Thus, courts must apply "faithfully the balance struck by the founding generation...." *Id.*

Of course, the Second Amendment does not protect *only* the literal "keep[ing]" and literal "bear[ing]" of existing arms. There would be no arms to "keep" or "bear" if the Government could restrict their creation or acquisition. The same would be true if the Government could ban their shipment or receipt. Indeed, if the Second Amendment did not "cover[]" (*Bruen*, 597 U.S. at 17) the shipment of firearms, then all commerce in firearms would grind to a halt. Thus, it is axiomatic that "[c]onstitutional rights … implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment). And so, *Bruen*'s "historical inquiry that courts must conduct" applies to all "present-day firearm regulations," the challenged statute included. *Bruen*, 597 U.S. at 28; *accord Pitsilides v. Barr*, 128 F.4th 203, 208 (3d Cir. 2025) (emphasis added) ("*Bruen* provides the governing methodology for assessing whether modern *firearm regulations* comport with the Second Amendment").

In blatant contravention of these principles, 18 U.S.C. § 1715 provides that, subject to certain limited exceptions not at issue here, "[p]istols, revolvers, and other firearms capable of being concealed on the person are nonmailable and shall not be deposited in or carried by the mails or delivered by any officer or employee of the Postal Service." Punishment is severe. Violators of this general prohibition "shall be fined under this title or imprisoned not more than two years,

or both." *Id.* Accordingly, a violation constitutes a Class E felony, punishable by fine of up to $250,000 for individuals. *Id.* §§ 3559(a)(5), 3571(b)(3).

Postal regulations mirror the statutory prohibition. U.S. Postal Service Publication 52 on "Hazardous, Restricted, and Perishable Mail" adopts provisions on the nonmailability of handguns and other concealable weapons. *See* 39 C.F.R. § 211.2(a)(2). If a violation of these regulations is discovered, Publication 52, § 435 provides that an offending firearm shipment "must be immediately reported to the Inspection Service in accordance with POM 139.117."

In other words, it is both a *felony* and a regulatory violation for ordinary Americans to use the mail to ship the "quintessential self-defense weapon" and "the most popular weapon chosen by Americans for self-defense in the home" and in public. *Heller*, 554 U.S. at 629. These prohibitions plainly violate the Second Amendment, and this case is easily resolvable under *Bruen*. Indeed, the U.S. Postal Service traces its lineage to 1775, meaning it has existed through the Founding era and beyond. But at no point did the Founders ever criminalize the mailing of handguns as the challenged statute does now. Indeed, it seems unlikely that the Founders would have required a citizen of South Carolina to ride a horse to Springfield Armory in Massachusetts to personally pick up a firearm. Nor did the Reconstruction generation criminalize the mailing of firearms, which confirms the Founding-era understanding. And because "20th-century evidence … does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence," *Bruen*, 597 U.S. at 66 n.28, the challenged 1927 law simply cannot stand on its own.

Plaintiffs include a Pennsylvania gun owner, along with two Second Amendment advocacy organizations that collectively represent thousands of similarly situated members and supporters both within this district and across the country. Plaintiffs are law-abiding citizens who wish to

3

utilize the U.S. Postal Service to mail handguns, free from detention, arrest, and prosecution under the challenged statute and regulations.

Because the federal ban on the mailing of handguns is inconsistent with (indeed, contrary to) the Founding-era historical tradition, it violates the Second Amendment. Plaintiffs therefore request permanent injunctive relief, as well as declaratory and other relief, to rectify and prevent further violation of their rights.

## LEGAL STANDARD

Under Fed. R. Civ. P. 56, "[s]ummary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *D.J.S.-W. v. United States*, 962 F.3d 745, 749 n.3 (3d Cir. 2020). In this Circuit, "[a] factual dispute is material if it bears on an essential element of the plaintiff's claim, and is genuine if a reasonable jury could find in favor of the nonmoving party." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 580 (3d Cir. 2003). Whether "the Second Amendment conflicts with the statutory scheme at issue here is a question of law...." *Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 433 n.7 (3d Cir. 2025).

## ARGUMENT

### I.    PLAINTIFFS HAVE STANDING.

To demonstrate standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). But a "plaintiff need not 'first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute'" when "fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative," even if a "criminal penalty provision has not yet been

applied...." *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 302 (1979); *see also id.* at 303 (standing lies when statute "authorizes imposition of criminal sanctions against" violators). Thus, "Damocles's sword does not have to actually fall … before the court will issue an injunction," *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016), and "where threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit...." *MedImmune, Inc. v. Genentech, Inc.*, 549 U. S. 118, 128-29 (2007) (emphasis removed). Traceability and redressability are "closely related" and typically "overlap" when a plaintiff challenges government action. *Toll Bros., Inc. v. Township of Readington*, 555 F.3d 131, 143 (3d Cir. 2009).

With respect to the first standing prong, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Pipito v. Lower Bucks Cnty. Joint Mun. Auth.*, 822 F. App'x 161, 164 (3d Cir. 2020). It cannot be disputed that 18 U.S.C. § 1715 and the aforementioned Postal Service regulations proscribe and punish the mailing of handguns by Plaintiffs, conduct "affected with a constitutional interest." Again, the challenged statute, 18 U.S.C. § 1715, provides in pertinent part that "[p]istols, revolvers, and other firearms capable of being concealed on the person are nonmailable and shall not be deposited in or carried by the mails or delivered by any officer or employee of the Postal Service." And a violation constitutes a Class E felony, punishable by fine of up to $250,000 for individuals. *Id.* §§ 3559(a)(5), 3571(b)(3).

Plaintiffs alleged an intention to utilize the Postal Service to mail handguns. Plaintiff Bonita Shreve is a citizen of the United States and of the Commonwealth of Pennsylvania, residing in Altoona, Pennsylvania. Plaintiffs' Statement of Material Facts ("SMF") ¶¶ 1-2. Shreve is a

member of Plaintiff Gun Owners of America, Inc. and is a law-abiding person over the age of 21 who is eligible to purchase and possess firearms under Pennsylvania and federal law. *Id.* ¶¶ 1, 3. Shreve does not hold a Federal Firearms License ("FFL"), nor is she engaged in the business of dealing in firearms as that term is defined under federal law. SMF ¶ 10; *see also* 18 U.S.C. § 921. Shreve desires to mail a handgun to her father, Arthur Zimmerman, as a gift, in compliance with Pennsylvania and federal law (aside from the challenged regulations). SMF ¶¶ 6, 8, 25, 26; *see also* 18 Pa.C.S. § 6111(c); 18 U.S.C. § 922. Shreve's father does not have an FFL and is not engaged in the firearms business. SMF ¶ 10.

Because Plaintiff Shreve's father lives approximately three hours away by car, and because Shreve has no intention of making such a long and expensive drive in the foreseeable future, Shreve wishes to ship the handgun directly to her father's home in eastern Pennsylvania. SMF ¶¶ 7-8, 25. However, because Shreve does not have an FFL, the shipping policies of private common carriers such as UPS and FedEx prevent her from shipping the handgun using those services. *Id.* ¶ 9. Thus, Shreve's only realistic remaining shipping option would be to use the U.S. Postal Service. But for Defendants' criminal enforcement of 18 U.S.C. § 1715 and Publication 52, Shreve immediately would use the U.S. Postal Service to mail the handgun to her father. *Id.* ¶¶ 12-13. And if Shreve were allowed to use the U.S. Postal Service to mail the handgun to her father, her father would receive and possess that intended gift. *Id*. ¶ 26.

The same is true for many of the members and supporters of Plaintiffs GOA and GOF who live throughout Pennsylvania. SMF ¶ 18. For example, one of GOA's Pennsylvania members owns a firearm training academy. *Id.* ¶ 19. This member often travels interstate with their handgun to attend firearm training courses. *Id.* When they do, they elect to drive rather than fly, due to the risk of theft of their handgun while it is outside of their possession and in airline custody. *Id.* But

if this person could legally mail their handgun to themselves at their ultimate destination on these interstate trips, and take a plane instead of driving, they would do so. *Id.*

Next, Plaintiff GOA has associational standing to bring suit on behalf of its members because "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 365 (3d Cir. 2015). First, at least one of Plaintiff GOA's members, Plaintiff Shreve, has standing to sue in her own right. Second, challenging the enforcement of an unconstitutional firearm regulation is relevant to Plaintiff GOA's organizational purpose of preserving and defending the Second Amendment rights of gun owners. *See* SMF ¶ 15. Third, neither the claims asserted nor the relief requested requires the participation of individual members of Plaintiff GOA, because Plaintiffs "seek[] a declaration, injunction, or some other form of prospective relief" which, "if granted, will inure to the benefit of those members." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

Plaintiff GOF has standing through its supporters too, because it has the indicia of membership sufficient to confer associational standing. GOF is a nonprofit legal defense and educational foundation that is supported by gun owners across the country, including in Pennsylvania. SMF ¶ 16. GOF receives all of its funding from its supporters, who voluntarily fund its activities. *Id.* ¶ 17. GOF litigates cases throughout the country on behalf of its supporters. *Id.* GOF's supporters receive information about its activities through a quarterly newsletter and regular emails about its activities. *Id.* And GOF's supporters regularly communicate their views to GOF about issues on which GOF should focus. *Id.* Thus, "[t]he foregoing, together, suffice for GOF's associational standing."). *Texas v. BATFE*, 737 F. Supp. 3d 426, 438 (N.D. Tex. 2024).

Next, there exists a credible threat of prosecution by Defendants, which also satisfies the traceability prong.  Defendant U.S. Postal Service ("USPS") is the agency responsible for promulgating the challenged postal regulations, and also for "investigat[ing] postal offenses … relating to the Postal Service," including the general prohibition on the mailing of handguns challenged here.  39 U.S.C. § 404(a)(6).  Defendant U.S. Postal Inspection Service ("USPIS") is the "primary law enforcement arm"[1] of USPS.  USPIS, including its "Postal Inspectors and other agents of the United States Postal Service," are responsible for "the enforcement of laws regarding property in the custody of the Postal Service, property of the Postal Service, the use of the mails, and other postal offenses."  18 U.S.C. §§ 3061(a), 3061(b)(1); *see also* 39 C.F.R. § 233.1.  Defendant David Steiner is the Postmaster General of the United States and is responsible for overseeing USPS's enforcement of the general prohibition on the mailing of handguns challenged here.  39 U.S.C. § 203; 39 C.F.R. § 222.1(a).[2]  Defendant Gary Barksdale is the Chief Postal Inspector of USPIS and is responsible for overseeing its operations, including the enforcement of the general prohibition on the mailing of handguns challenged here.  *See* 39 U.S.C. § 204; 39 C.F.R. §§ 4.5, 230.1, 233.1.  And finally, Defendant U.S. Department of Justice is the agency responsible for enforcing federal criminal laws, including the statutory criminal prohibition on the mailing of handguns.  *See* 28 U.S.C. § 533.

Defendants have not disclaimed enforcement of 18 U.S.C. § 1715 and Publication 52.  To the contrary, Defendants continue to enforce the statute and their regulations nationwide and, if Plaintiffs were to mail handguns in blatant violation of federal law, it is highly likely that

---

[1] *Leadership*, U.S. Postal Inspection Serv., https://www.uspis.gov/leadership (last visited December 12, 2025).

[2] Defendant Steiner is automatically substituted for Doug Tulino under Fed. R. Civ. P. 25(d).

Defendants would prosecute Plaintiffs for it, as they recently have prosecuted others. *See, e.g.*, *United States v. France*, 2022 U.S. Dist. LEXIS 150896 (N.D. Ga. June 24, 2022); *United States v. Bernal-Salinas*, 2022 U.S. Dist. LEXIS 160499 (E.D.N.C. Sept. 6, 2022); *United States v. Perez*, 2025 U.S. Dist. LEXIS 41420 (D. Conn. Mar. 7, 2025).

Finally, a favorable ruling declaring the challenged statute and its implementing regulations unconstitutional, and enjoining Defendants from enforcing them, would redress Plaintiffs' injury.

## II.    THE CHALLENGED STATUTE AND REGULATIONS VIOLATE THE SECOND AMENDMENT.

### A.    The Vestigial Federal Prohibition on the Mailing of Handguns.

Since 1927, federal law generally has prohibited the mailing of handguns using the U.S. Postal Service.[3]  Notably, FFLs are exempt from the statute's prohibition.  Thus, Defendant USPS currently handles untold numbers of handguns and other concealable weapons throughout its shipping network on behalf of commercial shippers.  But ordinary Americans are excluded from this service – although they curiously remain free to ship long guns like rifles and shotguns.[4]

At the time of the statute's Prohibition-era enactment, the nation was experiencing a perceived "crime wave," often exaggerated by newspaper reporting.  *See* Lee Kennett & James LaVerne Anderson, The Gun in America: The Origins of a National Dilemma 188 (Jon L. Wakelyn ed., Contributions in Am. Hist. Ser. No. 37, paperback ed. 1976).  Of particular concern to legislators was the easily concealed handgun, which proliferated from print-advertised "mail-order

---

[3] Act of Feb. 8, 1927, Pub. L. No. 69-583, 44 Stat. 1059 (codified as amended at 18 U.S.C. § 1715).

[4] But for the challenged statute's disparate treatment of Plaintiffs, federal law would prohibit Defendants from "mak[ing] any undue or unreasonable discrimination among users of the mails" or "grant[ing] any undue or unreasonable preferences to any such user," such as allowing federal firearms dealers to ship firearms, but prohibiting Plaintiffs from engaging in the same conduct.  39 U.S.C. § 403(c).

houses"[5] and quickly became not only a favored tool of self-defense, but also an implement of crime. *Id.* at 194. As one Detroit police chief lamented in 1924, "mail-order firms alone supplied 5,000 pistols a year to inhabitants of his city," whom he maligned as "dope addicts, feeble minded citizens, beer-runners, stick-up men, and gentlemen full of moonshine." *Id.* at 190-91.

Bolstered by these sorts of social attitudes and anti-gun media sensationalism, Members of Congress began to contemplate legislation to curb the American citizen's ready access to handguns and thus to the right to keep and bear arms. As one Representative from Washington stated during House debates in 1924:

> [t]his bill … forbidding the shipment of firearms that are capable of being concealed on the person through interstate carriers, it is hoped will minimize the prevalence of firearms in the hands of the undesirable criminal element of the country. … Every criminal, of course, carries concealed weapons. … [A]nd when a policeman or officer of the law gets after and pursues them the first thing they do is to get rid of their firearms, and then they just simply get one through the mail-order house.... This is to stop their replenishing themselves from the mail angle.... [66 Cong. Rec. 726 (daily ed. Dec. 17, 1924) (statement of Rep. Miller).[6]]

In contrast, opponents of the so-called "Miller Bill" that would become 18 U.S.C. § 1715 explained that the scope of the Second Amendment right should not vary in accordance with the crime rate. The "most vehement opponent of the Miller Bill was Congressman Thomas Blanton of Texas. It would not work, he insisted, since the criminal would get a gun in spite of any law." Kennett & Anderson, *supra*, at 200. As Representative Blanton warned:

> here is what this law would result in: You allow the dealers under this law to transport firearms and revolvers through the mails; you let officers transport revolvers through the mails, and you let everybody else except the law-abiding individual himself to do it, and here is what you are going to have: In certain parts of the State of New York, in West Virginia, in Alabama, in Tennessee, in Texas, and in the State of Washington there will be certain cities where there will be only one

---

[5] *See, e.g.*, Sears, Roebuck & Co. Catalogue No. 111, at 320 (1902), https://archive.org/details/sears-roebuck-catalogue-111/page/n173/mode/2up (advertising a variety of pistols for sale, with pricing as follows: "If by mail, postage extra, 40 cents.").

[6] https://www.congress.gov/bound-congressional-record/1924/12/17/house-section.

dealer accessible, and when a citizen wants to buy a revolver, even though he conforms to the regulations of the State laws, he is at the mercy of that one dealer, and he will have to pay not $20 for a good revolver, or $25, but he will have to pay $50 or $75 or $100 for it, and it will be beyond his reach financially, and we will be depriving a citizen of a right.... [66 Cong. Rec. 728 (daily ed. Dec. 17, 1924) (statement of Rep. Blanton).]

The Miller Bill "was eventually passed by the Senate and signed into law in 1927[,] … effectively clos[ing] the mails to the pistol."  Kennett & Anderson, *supra*, at 201. But, unsurprisingly, enactment of the statute did little – if anything – to curb violent crime.  *See* Kennett & Anderson, *supra*, at 201-02.  Nevertheless, purported prevention of crime became a common refrain for subsequent federal enactments restricting firearms, including the National Firearms Act of 1934, the Federal Firearms Act of 1938, and the Gun Control Act of 1968.  *See generally* Kennett & Anderson, *supra*.

Importantly, at the time of the statute's 1927 enactment, no other federal firearms restrictions existed.  That is no longer the case, as the Gun Control Act and Brady Handgun Violence Prevention Act subsequently enacted a pervasive scheme governing interstate shipment, transportation, and background verification controls.  *See* 18 U.S.C. § 922.  Thus, to the extent the Miller Bill's original policy justification had any validity then, or any relevance under *Bruen* now (it does not), the enactment of numerous additional federal controls since has rendered 18 U.S.C. § 1715 obsolete.  *See also FEC v. Ted Cruz for Senate*, 596 U.S. 289, 306 (2022) ("Such a prophylaxis-upon-prophylaxis approach … is a significant indicator that the regulation may not be necessary for the interest it seeks to protect.").

Yet today, ordinary Americans still are effectively barred from shipping their handguns for private, noncommercial, lawful purposes, even though the U.S. Mail remains available for the shipment of long guns.  Indeed, ordinary Americans have no realistic option available to ship

handguns, as private common carriers have prohibited the practice for several years.[7]  Recognizing this impossibility, Members of Congress recently have introduced legislation to repeal 18 U.S.C. § 1715 entirely and prohibit Defendant Postmaster General from promulgating rules restricting the mailing of firearms.  *See* Protecting the Mailing of Firearms Act, H.R. 3033, 119th Cong. (2025).[8]  But those legislative attempts have not yet reached fruition.  Meanwhile, Second Amendment rights continue to be infringed.

### B. Current Postal Regulations.

Pursuant to 18 U.S.C. § 1715, Defendant USPS has promulgated regulations governing the shipment of firearms in Postal Service Publication 52.[9]  For instance, postal regulations provide that "[p]istols, revolvers, and other firearms capable of being concealed on the person (for example, short-barreled shotguns and short-barreled rifles) are defined as handguns."  Publication 52, *supra*, § 431.2.  Moreover, "[h]andguns and other firearms capable of being concealed on the person are nonmailable unless mailed between" parties as listed in the regulations, and only after the filing of an affidavit as required by the regulation.[10]  Publication 52, *supra*, § 432.2.  Those

---

[7] *See, e.g.*, *How to Ship Firearms*, UPS, https://www.ups.com/us/en/support/shipping-support/shipping-special-care-regulated-items/prohibited-items/firearms (last visited December 12, 2025); *How to Ship Firearms*, FedEx, https://www.fedex.com/en-us/shipping/how-to-ship-firearms.html (last visited December 12, 2025); *U.S. Prohibited Commodities*, DHL, https://www.dhl.com/discover/en-us/ship-with-dhl/start-shipping/restricted-commodities.

[8] https://www.congress.gov/bill/119th-congress/house-bill/3033/text.

[9] *See* 39 C.F.R. § 211.2(a)(2) ("The regulations of the Postal Service consist of" the Domestic Mail Manual … and "Publication 52...."); *see also Firearms*, USPS Postal Explorer, https://pe.usps.com/text/pub52/welcome.htm (last visited December 12, 2025) (hereinafter "Publication 52").

[10] While 18 U.S.C. § 930(a) criminalizes "knowingly posses[ing] or caus[ing] to be present a firearm" in a Post Office, § 930(d)(3) exempts "the lawful carrying … incident to … other lawful purposes."  And since Chapter 43 of Publication 52 permits mailing of rifles and shotguns at the Post Office, a lawful purpose, Section 930 does not separately restrict Plaintiffs' intended course of action.  *See also Firearms Pol'y Coal. Inc. v. Bondi*, Civil Action No. 4:24-CV-00565-O, 2025 LX 498704 (N.D. Tex. Sep. 30, 2025) (finding Section 930 to be unconstitutional).

12

regulations, in turn, provide that "handguns may be mailed by a licensed manufacturer of firearms, a licensed dealer of firearms, a licensed importer of firearms," or various "authorized" agents of federal or state governments, upon "filing the required affidavit or certificate." Publication 52, *supra*, § 432.21. Of course, as noted above, Plaintiff Shreve is not engaged in the business of dealing in firearms and thus does not hold an FFL.

## C. The Second Amendment.

### 1. Methodology.

The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In its landmark 2008 decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court rejected the nearly uniform opinions reached by the courts of appeals, which for years had claimed that the Second Amendment protects only a communal right of a state to maintain an organized militia. *Id.* at 581. Setting the record straight, the *Heller* Court explained that the Second Amendment recognizes, enumerates, and guarantees to *individuals* the preexisting right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *Id.* at 592.

Then, in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court explained that the Second Amendment is fully applicable to the states through operation of the Fourteenth Amendment. *Id.* at 791. Next, in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), the Court reaffirmed its conclusion in *Heller* that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," and that this "Second Amendment right is fully applicable to the States." *Id.* at 411.

As the Supreme Court explained in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the Second and Fourteenth Amendments together guarantee individual Americans not only the right to "keep" firearms in their homes, but also the right to "bear arms," meaning "to carry a handgun for self-defense outside the home," free from infringement by either federal or state governments. *Id.* at 10. Finally, the Supreme Court's latest pronouncement on the Second Amendment reaffirms the textual and historical framework from *Heller* and *Bruen*. *See United States v. Rahimi*, 602 U.S. 680, 692 (2024) (explaining that *Bruen* reiterates "the appropriate analysis"); *see also id.* at 714 (Gorsuch, J., concurring) ("reinforc[ing] the focus on text, history, and tradition, following exactly the path we described in *Bruen*").

In addition to clearly recognizing the right of "'law-abiding, responsible citizens' … to public carry," *Bruen* also rejected outright the methodology used within this Circuit and other circuits to judge Second Amendment challenges. *Bruen*, 597 U.S. at 38 n.9. Prior to *Bruen*, the Third Circuit had adopted a two-part test for analyzing Second Amendment cases: "First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. If it does not, our inquiry is complete. If it does, we evaluate the law under some form of means-end scrutiny." *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010) (citation omitted); *see also Bruen*, 597 U.S. at 22 n.4 (collecting cases using two-part test). Other circuit courts adopted and used a substantially similar formula, which invariably utilized the very same "judge-empowering 'interest-balancing inquiry'" that *Heller* had rejected. *See Heller*, 554 U.S. at 634; *see also Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1117 (S.D. Cal. 2017) ("the Ninth Circuit uses what might be called a tripartite binary test with a sliding scale and a reasonable fit"), *aff'd*, 742 F. App'x 218 (9th Cir. 2018).

Rejecting this widespread atextual, "judge-empowering" interest-balancing approach as "one step too many," *Bruen* directed (again) the federal courts to first principles: to assess the text of the Second Amendment, informed by the historical tradition. *Bruen*, 597 U.S. at 19, 22. First, the Supreme Court "decline[d] to adopt that two-part approach" used in this and other circuits, and reiterated that, "[i]n keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 17.

Second, the Supreme Court held that, "[t]o justify [a] regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, 597 U.S. at 17; *see also Rahimi*, 602 U.S. at 692 ("As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition.").

Third, in reviewing the historical evidence, the *Bruen* Court cabined review of relevant history to a narrow time period, because "not all history is created equal," focusing on the period around the ratification of the Second Amendment, and *perhaps* the Fourteenth Amendment, but only to the extent that it "mere[ly] confirm[s]" a Founding-era tradition. *Bruen*, 597 U.S. at 37. Indeed, the Court noted that "post-ratification" interpretations "cannot overcome or alter th[e] text," and "we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* at 36, 37; *see also id.* at 37-60 (discussing the lack of relevant historical prohibitions on concealed carry in public).

15

In other words, according to the Second Amendment's text, and as elucidated by the Court in *Bruen*, if a member of "the people" wishes to "keep" or "bear" an "Arm[]," then the ability to do so "shall not be infringed." It does not matter at all how important, significant, compelling, or overriding the government's interest is in infringing the right. Nor does it matter whether a government restriction "minimally" versus "severely" burdens (infringes) the Second Amendment. There are no relevant statistical studies to be consulted. There are no sociological arguments to be considered. The ubiquitous problems of crime or the density of population do not affect the equation. The only appropriate inquiry then, according to *Bruen*, is what the "public understanding of the right to keep and bear arms" was during the ratification of the Second Amendment in 1791. *Bruen*, 597 U.S. at 46-47.

Following the Supreme Court's instruction, the Third Circuit has explained that "the constitutional right to keep and bear arms should be understood according to its public meaning in 1791," and that "laws enacted in the late-19th century" or later "'do not provide as much insight into' the original meaning of the right to keep and bear arms as do earlier sources." *Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 441 (3d Cir.), *reh'g en banc denied*, 130 F.4th 65 (3d Cir. 2025), *followed by United States v. Quailes*, 126 F.4th 215, 222 (3d Cir. 2025) (alteration in original) ("Practices into the 19th century provide 'confirmation of [what the Founding-era laws] established.'"); *accord Reese v. BATFE*, 127 F.4th 583, 594 (5th Cir. 2025) ("founding-era laws are far more probative of what 'the people' meant when the Second Amendment was ratified"); *United States v. Williams*, 113 F.4th 637, 648 (6th Cir. 2024) ("Under *Bruen*, … courts must study how and why the founding generation regulated firearm[s]"); *Worth v. Jacobson*, 108 F.4th 677, 692, 696 (8th Cir. 2024) ("*Bruen* strongly suggests that we should prioritize Founding-era history," and "it is questionable whether the Reconstruction-era sources have much weight"); *NRA v. Bondi*,

133 F.4th 1108, 1115 (11th Cir. 2025) ("the Founding era is the primary period against which we compare the Florida law").[11]

In addition to providing the proper time focus for historical review, the Supreme Court also has instructed as to the scope of the protected persons, conduct, and arms covered by the Second Amendment.

**First, the people.** *Heller* noted that, "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. *Heller* cited to *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990), which explained that "'the people' … refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *See also Heller*, 554 U.S. at 581 (Second Amendment "is exercised individually and belongs to all Americans."). Thus, as the Third Circuit recently explained, "[t]he Second Amendment's reference to 'the people' covers all adult Americans," and the term "cast[s] a wide net" to include 18-to-20-year-olds and even felons as a presumptive matter. *Lara*, 125 F.4th at 435, 436. It is indisputable that Plaintiffs, law-abiding American citizens, are members of "the people."

**Second, the protected arms.** With respect to the term "Arms," the Court explained that such term includes "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another," and at the Founding, "all firearms constituted 'arms.'" *Heller*,

---

[11] To be sure, some courts have disagreed with the Supreme Court's Founding-era focus. *See, e.g., Antonyuk v. James*, 120 F.4th 941, 972 (2d Cir. 2024) ("1868 and 1791 are both focal points of our analysis"). But not even Reconstruction-era evidence can support the statute challenged here, because the postal shipment of handguns was not restricted until 1927 – far too late to be relevant under any reading of *Bruen*. Thus, with respect to the mailing of pistols, "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same...." *Bruen*, 597 U.S. at 38.

554 U.S. at 581.  Thus, because not only those items and activities in "existence in the 18th century are protected" by the Constitution, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," *id.* at 582, and "that general definition covers modern instruments that" so much as "*facilitate* armed self-defense."  *Bruen*, 597 U.S. at 28 (emphasis added); *see also Rahimi*, 602 U.S. at 691-92 ("As we explained in *Heller* … the reach of the Second Amendment is not limited only to those arms that were in existence at the founding. … Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers.").  There is no question as to handguns' protection under the Second Amendment.  Indeed, "the Second Amendment protects the possession and use of weapons that are 'in common use at the time,'" and there is no "dispute that handguns are weapons 'in common use' today for self-defense."  *Bruen*, 597 U.S. at 21, 32 (cleaned up).

  **Third, the protected conduct.**  In its analysis, *Heller* turned to the "substance of the right: 'to keep and bear Arms.'"  *Heller*, 554 U.S. at 581.  The Court explained that "'[k]eep arms' was simply a common way of referring to possessing arms, for militiamen *and everyone else*."  *Id.* at 583.  Next, the Court instructed that the "natural meaning" of "bear arms" was "wear, bear, or carry … upon the person or in the clothing or in a pocket, for the purpose … of being armed and ready for offensive or defensive action in a case of conflict with another person."  *Id.* at 584.  And "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'"  *Id.*  *Bruen,* in fact, was more explicit, explaining that the "definition of 'bear' naturally encompasses public carry."  *Bruen*, 597 U.S. at 32.

  Of course, the Second Amendment's plain text does not cover *only* the literal 'keeping' and literal 'bearing' of arms.  It also must cover ancillary acts like the acquisition, transportation,

18

shipment, and receipt of firearms, because "[c]onstitutional rights … implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment); *see also Griswold v. Connecticut*, 381 U.S. 479, 482-83 (1965) ("The right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read … and freedom of inquiry, freedom of thought, and freedom to teach.... Without those peripheral rights the specific rights would be less secure."); *Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982) ("'the Constitution protects the right to receive information and ideas,'" and "the right to receive ideas follows ineluctably from the *sender's* First Amendment right to send them"); *Bruen*, 597 U.S. at 70 ("The [Second Amendment] is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'").

Indeed, if the Second Amendment's plain text did not cover such ancillary acts as shipment or receipt, then the Government could ban these acts outright, crippling Americans' access to firearms. For example, if Plaintiffs had no right to "ship" their firearms – not even to *themselves* – then neither would commercial entities like Federal Firearms Licensees, which cannot possibly enjoy *more* rights than individuals. Thus, Congress's current allowance of the mailing of long guns would merely be an act of legislative grace – one that could be revoked at will. And if Congress might entirely ban the shipment of firearms through the U.S. Postal Service, then surely it could ban their shipment through other common carriers, too. Finally, if Congress could ban handgun shipments, it could also ban long gun shipments. In other words, finding the challenged statute constitutional would mean that Congress could entirely prohibit the transportation of firearms by third-party bailees. But that would mean "Congress could throttle gun ownership without implicating Second Amendment scrutiny by just banning the [shipment] of firearms. What

a marvelous, Second Amendment loophole!" *United States v. Hicks*, 649 F. Supp. 3d 357, 360 (W.D. Tex. 2023), *rev'd on other grounds*, 2025 U.S. App. LEXIS 18297 (5th Cir. July 23, 2025). Indeed, that cannot possibly be the law, and there is no principled point along that continuum to draw a line in the sand.

Accordingly, numerous courts have held all manner of ancillary and concomitant acts to be presumptively protected by the Second Amendment's plain text:

> The Court recognized in *Bruen* that the conduct at issue there, possessing a firearm, was presumptively protected by the Amendment, so as to require that the challenged law be justified based on "the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2130. The same is so of the conduct to which § 922(n) is addressed – shipping, receiving, or transporting a firearm – as the courts to consider that question have uniformly held. *See, e.g.*, *Holden*, 2022 U.S. Dist. LEXIS 212835, 2022 WL 17103509, at *3 ("Receiving a firearm is … presumptively protected by the Second Amendment"); *Stambaugh*, 2022 U.S. Dist. LEXIS 206016, 2022 WL 16936043, at *3 (felony indictees are part of "the people" in the Second Amendment and Second Amendment covers receipt of handgun); *Kelly*, 2022 U.S. Dist. LEXIS 215189, 2022 WL 17336578, at *2-3 (same); *Hicks*, 2023 WL 164170, at *2 (same); *Quiroz*, 2022 U.S. Dist. LEXIS 168329, 2022 WL 4352482, at *4 ("[D]oes the Second Amendment's plain text cover the conduct [of receiving a firearm]? Without a doubt the answer here is yes."). [*United States v. Rowson*, 652 F. Supp. 3d 436, 459 (S.D.N.Y. 2023).[12]]

Thus, the Second Amendment protects the purchase and acquisition of firearms (*see Nguyen v. Bonta,* 140 F.4th 1237, 1243 (9th Cir. 2025); *Sedita v. United States*, 763 F. Supp. 3d 63, 76 (D.D.C. 2025)), the "transportation, sale, or transfer of firearms" (*see Lynchburg Range & Training, LLC v. Northam*, 105 Va. Cir. 159, 162 (Lynchburg 2020)), the receipt of firearms (*see Hicks*, 649 F. Supp. 3d at 360), and training with firearms (*see Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)).  In short, shipping and receiving protected arms is conduct protected by the Second Amendment.  *See Pitsilides v. Barr*, 128 F.4th at 208 (emphasis added) ("*Bruen* provides the

---

[12] *See also United States v. Adger*, 2023 U.S. Dist. LEXIS 77363, at *7 (S.D. Ga. May 3, 2023) ("federal courts appear to agree the Second Amendment covers … the conduct of shipping, transporting, and receiving firearms").

governing methodology for assessing whether modern *firearm regulations* comport with the Second Amendment").

That conclusion is consonant with *Bruen*'s methodology. As *Bruen* explained, the circuit courts' prior "two-step approach" was "one step too many." *Bruen*, 597 U.S. at 19. Properly understood, *Bruen* reiterated a *one-step* test: "text, as informed by history." *Id.* Thus, this Court's textual analysis should be nothing more than a subject-matter qualifier: 'Are we talking about a firearm regulation, or not?' The challenged statute certainly is one. *See id.* at 28 ("confronting such present-day firearm regulations"); *see also Regulation*, <u>Merriam Webster</u>, https://tinyurl.com/musrnhm4 (last visited Dec. 12, 2025) ("a rule or order issued by an executive authority or regulatory agency of a government and having the force of law").

At bottom, the Second Amendment's plain text presumptively applies to "all Americans," presumptively extends to all "bearable arms," and presumptively covers the shipment and receipt of firearms, which is a prerequisite to "keep[ing] and bear[ing]" them. Any "firearm regulation" (*Bruen*, 597 U.S. at 17) governing those activities is presumptively unconstitutional, and Defendants bear the burden of showing that any such regulation comports with a broad and enduring historical tradition demonstrating that certain persons, activities, or arms were never considered within the scope of the Second Amendment in the first place. Defendants will be unable to make that showing.

### 2. The Challenged Statute and Regulations Violate the Second Amendment.

The statute and Publication 52 (as incorporated by 39 C.F.R. § 211.2(a)(2)) prohibit Plaintiffs from lawfully mailing handguns to themselves or to others who are eligible to receive and possess them. *See* 18 U.S.C. § 1715. Yet Plaintiffs undoubtedly are members of "the people" protected by the Second Amendment, being law-abiding adult American citizens. *See Lara*, 125

F.4th at 435. Nor is there any "dispute that handguns are weapons 'in common use' today for self-defense" and are protected by the Second Amendment. *Bruen*, 597 U.S. at 32; *Heller*, 554 U.S. at 628. And finally, the Second Amendment necessarily protects the right to ship, transfer, transport, and receive firearms. *See, e.g.*, *Rowson*, 652 F. Supp. 3d at 459 (collecting cases).[13]

Accordingly, Plaintiffs' "proposed course of conduct" – the shipment and receipt of handguns and other concealable weapons using the U.S. Mail – is "presumptively guarantee[d]" by the Second Amendment, and Defendants "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 32, 33, 17. Defendants cannot meet their heavy burden because there is no historical tradition of prohibiting the mailing of handguns during the relevant analytical time period. Indeed, 18 U.S.C. § 1715 dates only to 1927, postdating the Founding era by well over a century, and Reconstruction by many decades. With no relevant historical tradition to support its gun ban, the challenged statute and the provisions of Publication 52 restricting the mailing of handguns are unconstitutional.

3. **Contrary to Supporting the Challenged Statute, the Historical Tradition Supports Plaintiffs.**

From the Founding until 1927, Americans were free to use the mails to ship firearms, and the practice was widespread. Indeed, the challenged statute "was intended to reduce crime by controlling a *previously socially permissible practice*." Barrett Sharpnack, *Firepower by Mail: "Gun-Toting," State Regulation, and the Origins of Federal Firearms Legislation, 1911-1927*, at 7, <u>Case W. Reserve Univ.</u> (May 2015) (emphasis added).[14] So "permissible" was this practice that, prior to its 1927 federal prohibition, the largest retailers in the country commonly sold handguns

---

[13] In a far more recent 1986 enactment, Congress *itself* recognized the Second Amendment right to transport firearms. *See* 18 U.S.C. § 926A.

[14] https://etd.ohiolink.edu/acprod/odb_etd/ws/send_file/send?accession=case1433579362&disposition=inline.

via mail order. For example, in an 1897 catalog, Sears, Roebuck & Co. offered a number of handguns for sale through the mail, including Colt Single Action Army revolvers.[15] Likewise, in an 1895 catalog, Montgomery Ward advertised revolvers that could be "sent by mail when so ordered. Postage, 1 cent per ounce in weight."[16] It was not until 1927, after enactment of the challenged statute, that "Sears Roebuck and Butler Brothers, two of America's best known mail order houses, dropped pistols from their catalogs." Sharpnack, *supra*, at 7 (citing Kennett & Anderson, *supra*, at 201). In this case, the historical tradition supports Plaintiffs' right to ship and receive firearms through the mail.

## CONCLUSION

For the reasons stated, this Court should grant Plaintiffs' Motion for Summary Judgment and enter judgment in their favor, (i) declaring 18 U.S.C. § 1715 and its implementing postal regulations to be an infringement on Plaintiffs' Second Amendment rights, and (ii) enjoining Defendants from implementing or enforcing the statute and postal regulations.

Dated: December 18, 2025

Respectfully submitted,

/s/ Oliver M. Krawczyk
Gilbert J. Ambler (PA 326124)
Oliver M. Krawczyk (PA 334423)
AMBLER LAW OFFICES, LLC
115 South Hanover Street, Suite 100
Carlisle, PA 17013
T: (717) 525-5822
F: (540) 773-2414
gilbert@amblerlawoffices.com
oliver@amblerlawoffices.com

/s/ Stephen D. Stamboulieh
Stephen D. Stamboulieh (MS 102784)
STAMBOULIEH LAW, PLLC
P.O. Box 428
Olive Branch, MS 38654
T: (601) 852-3440
stephen@sdslaw.us

*Attorneys for Plaintiffs*

---

[15] *See* Sears, Roebuck & Co. Catalogue No. 104, at 574 (1897), https://archive.org/details/sears-roebuck-catalog-104-spring-1897/page/574/mode/2up?q=revolver.

[16] *See* Montgomery Ward & Co.'s Catalogue No. 57, at 467 (1895), https://archive.org/details/montgomerywardco00mont/page/466/mode/2up?q=revolver.

23

## <u>CERTIFICATE OF SERVICE</u>

I, Oliver M. Krawczyk, hereby certify that I have on this day, caused the foregoing document or pleading to be filed with this Court's CM/ECF system, which generated a Notice of Electronic Filing and delivered a copy of the foregoing to all counsel of record.

Dated: December 18, 2025

*/s/ Oliver M. Krawczyk*
Oliver M. Krawczyk