## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| BONITA SHREVE; GUN OWNERS OF AMERICA, INC.; and GUN OWNERS FOUNDATION,<br><br>                     Plaintiffs,<br><br>          v.<br><br>UNITED STATES POSTAL SERVICE; DOUG TULINO, in his official capacity as U.S. Postmaster General; UNITED STATES POSTAL INSPECTION SERVICE; GARY BARKSDALE, in his official capacity as Chief Postal Inspector; and UNITED STATES DEPARTMENT OF JUSTICE,<br><br>                     Defendants. | Hon. Stephanie L. Haines, U.S.D.J.<br><br>Civil Action No. 3:25-cv-00214<br><br>**ORAL ARGUMENT REQUESTED** |

## BRIEF IN SUPPORT OF MOVANT STATES'
## MOTION TO INTERVENE AS DEFENDANTS

KATHY JENNINGS
Attorney General
State of Delaware
Carvel State Building
820 North French Street
Wilmington, DE 19801

Ian Liston
Jennifer Kate Aaronson
Office of Impact Litigation
Of Counsel

JENNIFER DAVENPORT
Attorney General
State of New Jersey
25 Market Street
Trenton, NJ 08625

Meghan Musso
Deputy Attorney General
Of Counsel

LETITIA JAMES
Attorney General
State of New York
28 Liberty Street
New York, NY 10005

James M. Thompson
Molly Thomas-Jensen
Special Counsel
Danny Yao Li
Assistant Solicitor General
Of Counsel

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

BACKGROUND ............................................................................................................... 2

    A.  Section 1715. ....................................................................................................... 2

    B.  This Case And The Federal Government's Non-Defense Announcement. ..................... 4

ARGUMENT ................................................................................................................... 6

  I.   MOVANT STATES ARE ENTITLED TO INTERVENE AS OF RIGHT. ...................... 6

    A.  Movant States Have Substantial Interests That Would Be Impaired If Plaintiffs Obtain The Relief They Seek. ................................................................................................ 7

    B.  Existing Parties No Longer Adequately Represent Movant States' Interests. ............... 17

    C.  Movant States' Swift Intervention Is Timely. ............................................................. 20

  II.  ALTERNATIVELY, PERMISSIVE INTERVENTION IS APPROPRIATE. ................. 23

CONCLUSION ................................................................................................................ 24

## **TABLE OF AUTHORITIES**

***Cases***

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
    458 U.S. 592 (1982) ................................................................................................ 14

*Am. Farm Bureau Fed'n v. E.P.A.*,
    278 F.R.D. 98 (M.D. Pa. 2011) .............................................................................. 18

*Benjamin ex rel. Yock v. Dep't of Pub. Welfare of Pa.*,
    701 F.3d 938 (3d Cir. 2012) ................................................................................... 20

*Berger v. N.C. State Conf. of the NAACP*,
    597 U.S. 179 (2022) ........................................................................................... 7, 19

*Biden v. Nebraska*,
    600 U.S. 477 (2023) ................................................................................................. 8

*Brody ex rel. Sugzdinis v. Sprang*,
    957 F.2d 1108 (3d Cir. 1992) ........................................................................ 6, 7, 19

*Brumfield v. Dodd*,
    749 F.3d 339 (5th Cir. 2014) ................................................................................. 19

*California v. ATF*,
    718 F. Supp. 3d 1060 (N.D. Cal. 2024) ................................................................... 8

*California v. Texas*,
    593 U.S. 659 (2021) ............................................................................................... 18

*Cameron v. EMW Women's Surgical Ctr., P.S.C.*,
    595 U.S. 267 (2022) ................................................................................... 14, 20, 22

*Cook Cnty., Ill. v. Texas*,
    37 F.4th 1335 (7th Cir. 2022) ................................................................................ 21

*DeOtte v. Nevada*,
    20 F.4th 1055 (5th Cir. 2021) ........................................................................... 18, 19

*Dep't of Com. v. New York*,
    588 U.S. 752, 768 (2019) ....................................................................................... 11

*Dep't of Lab. v. Triplett*,
    494 U.S. 715 (1990) ............................................................................................... 14

*Gen. Land Office v. Biden*,
   71 F.4th 264 (5th Cir. 2023) ................................................................................. 8

*Harper v. Pub. Serv. Comm'n*,
   396 F.3d 348 (4th Cir. 2005) ................................................................................ 15

*Huisha-Huisha v. Mayorkas*,
   No. 22-5325, 2022 WL 19653946 (D.C. Cir. Dec. 16, 2022) ................................. 21

*Kleissler v. United States Forest Serv.*,
   157 F.3d 964 (3d Cir. 1998) ...................................................................... 6, 7, 8, 18

*Liberty Mut. Ins. Co. v. Treesdale, Inc.*,
   419 F.3d 216 (3d Cir. 2005) ............................................................................... 6, 7

*Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*,
   72 F.3d 361 (3d Cir. 1995) ............................................................................. 18, 20

*N.L.R.B. v. Frazier*,
   144 F.R.D. 650 (D.N.J. 1992) ................................................................................ 6

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
   597 U.S. 1 (2022) ................................................................................................ 19

*NAACP v. New York*,
   413 U.S. 345 (1973) ............................................................................................ 20

*Nat'l Parks Conservation Ass'n v. EPA*,
   759 F.3d 969 (8th Cir. 2014) ................................................................................. 8

*New Jersey v. EPA*,
   989 F.3d 1038 (D.C. Cir. 2021) ............................................................................. 8

*Pennsylvania v. President United States of Am.*,
   888 F.3d 52 (3d Cir. 2018) .................................................................................... 8

*Sierra Club v. Espy*,
   18 F.3d 1202 (5th Cir. 1994) ............................................................................... 22

*State v. Biden*,
   10 F.4th 538 (5th Cir. 2021) .................................................................................. 8

*Trbovich v. United Mine Workers of Am.*,
   404 U.S. 528 (1972) ............................................................................................ 18

*United States v. Powell,*
  423 U.S. 87 (1975).................................................................... 1, 3, 15

*United States v. Territory of V.I.,*
  748 F.3d 514 (3d Cir. 2014).......................................................... 18, 19

*United States v. Washington,*
  596 U.S. 832 (2022)...................................................................... 12

*Utah Ass'n of Counties v. Clinton,*
  255 F.3d 1246 (10th Cir. 2001) ...................................................... 18

*Va. House of Delegates v. Bethune-Hill,*
  587 U.S. 658 (2019)........................................................................ 8

*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens,*
  529 U.S. 765  (2000)...................................................................... 15

*Wallach v. Eaton Corp.,*
  837 F.3d 356 (3d Cir. 2016).......................................................... 22

### Statutes

18 Pa. Cons. Stat. § 6111 (2019) ............................................................ 3

18 U.S.C. § 1715 ................................................................... passim

18 U.S.C. § 922 ..................................................................... passim

18 U.S.C. § 923 .............................................................................. 14

27 C.F.R. § 478.124 ........................................................................ 14

27 C.F.R. § 478.99 .......................................................................... 15

28 U.S.C. § 530D ............................................................................ 21

720 Ill. Comp. Stat. 5/24-1.9 .......................................................... 17

Del. Code Ann. tit. 10, § 7704 ........................................................ 13

Del. Code Ann. tit. 11, § 1444 ................................................... 10, 16

Del. Code Ann. tit. 11, § 1448 ..................................................... 9, 14

Del. Code Ann. tit. 11, § 1448A ................................................... 9, 16

Del. Code Ann. tit. 11, § 1448D ........................................................................ 9, 16

N.J. Stat. Ann. § 2C:25-17 et seq. ........................................................................ 13

N.J. Stat. Ann. § 2C:39-1 ........................................................................ 10, 11, 17

N.J. Stat. Ann. § 2C:39-3 ........................................................................ 10, 16

N.J. Stat. Ann. § 2C:39-5 ........................................................................ 10

N.J. Stat. Ann. § 2C:58-20 et seq. ........................................................................ 13

N.J. Stat. Ann. § 2C:58-23 ........................................................................ 14

N.J. Stat. Ann. § 2C:58-3 ........................................................................ 9, 10, 16

N.Y. Crim. Pro. Law § 530.14 ........................................................................ 13

N.Y. Gen. Bus. Law § 898 ........................................................................ 9, 16

N.Y. Penal Law § 265.00 ........................................................................ 10, 11

N.Y. Penal Law § 265.02 ........................................................................ 10, 16

N.Y. Penal Law § 265.60 et seq. ........................................................................ 10

N.Y. Penal Law § 400.00 ........................................................................ 9

N.Y.C. Admin. Code § 10-302.1 ........................................................................ 10

## *Other Authorities*

18 U.S.C. § 530D ........................................................................ 21

49 Op. O.L.C. (Jan. 15, 2026) ........................................................................ passim

66 Cong. Rec. 726 (1924) ........................................................................ 3

7C Wright & Miller's Federal Practice and Procedure § 1909 (3d ed. Supp. 2022) ................... 19

Br. for United States as Amicus Curiae, *ANJRPC v. Att'y Gen. N.J.*, No. 24-2415, ECF No. 95 (3d. Cir. Sept. 18, 2025) ........................................................................ 17

Br. for United States as Amicus Curiae, *Barnett v. Raoul*, No. 24-3060, ECF No. 83 (7th Cir. June 13, 2025) ........................................................................ 16, 17

*Carrying of Pistols, Revolvers, and Other Firearms, Capable of Being Concealed on the Person in the Mails: Hearing on H.R. 4502 before the H. Subcomm. on the Post Office and Post Roads*, 69th Cong. 2 (Feb. 17, 1926) .......................................................................... 3

Government's Supp. Resp. to Pet. for Reh'g En Banc, *United States v. Peterson*, No. 24-30043, ECF No. 135 (5th Cir. May 29, 2025) ................................................................... 17

H. R. Rep. No. 610, 69th Cong., 1st Sess. (1926) ......................................................... 3

U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Trace Data: New York - 2023*, https://www.atf.gov/firearms/report/firearms-trace-data/firearms-trace-data-new-york-2023 (last visited Mar. 2, 2026) ............................................................................... 13

U.S. Dept. of Justice, Office of Information Policy, *Letters Submitted to Congress Pursuant to 28 U.S.C. § 530D* ...................................................................................................... 21

U.S. Postal Serv. Publ'n 52 (2025) ................................................................................ 4

**Rules**

Fed. R. Civ. P. 24 ..................................................................................................... 6, 23

## INTRODUCTION

This lawsuit challenges the constitutionality of 18 U.S.C. § 1715 ("Section 1715"), a century-old federal law that generally makes the United States Postal Service (USPS) unavailable to facilitate the shipment of concealable firearms. Although federal law authorizes individuals to mail firearms via common carriers, subject to a series of careful federal laws to ensure such mailed arms do not end up in the hands of prohibited persons, *see* 18 U.S.C. § 922(e)–(f), Congress concluded that USPS should not be providing such services in this marketplace. It had a good reason why: Congress wanted "to avoid having the Post Office serve as an instrumentality for the violation of local laws which prohibited the purchase and possession of weapons," and "make it more difficult for criminals to obtain concealable weapons." *United States v. Powell*, 423 U.S. 87, 91 (1975). That congressional judgment has stood for over a century. Yet Plaintiffs seek an unprecedented order enjoining Section 1715's enforcement—thereby requiring USPS to transport firearms for private mailers.

Because the federal government recently announced that it will no longer defend this law on the merits, this Court should grant New Jersey, New York, and Delaware the ability to intervene to provide the Second Amendment defense that no other party currently will. Courts have repeatedly made clear that putative intervenors should be allowed to participate when they have interests that would be impaired by an adverse judgment not protected by any other party, and intervention would not prejudice existing parties. Those considerations are easily satisfied. Movant States have multiple substantial interests that would be impaired if Plaintiffs obtain their requested relief enjoining Section 1715 as unconstitutional: invalidation of this statute would injure their sovereign interests in the enforcement of their state firearm safety laws, and impose significant law enforcement costs resulting from shipment of firearms prohibited in their States and to persons prohibited

from possessing them. Those interests are no longer represented by the Federal Defendants, which no longer offers any defense of this critical public safety law on the merits, based on their unprecedented determination that this longstanding federal statute is unconstitutional, at least in certain applications. Nor will prejudice arise to any existing parties: Movant States seek to participate only to provide the constitutional defense of the challenged law that the existing defendants recently disclaimed, and their intervention will not delay proceedings where they will brief their dispositive motion on this Court's existing schedule. Far from prejudice, Movant States' participation will only benefit this Court by ensuring it has adversarial presentation on these Second Amendment issues should it reach them, as the Movant States' briefing contains a significant body of history not addressed by either current party. To ensure no decision issues that harms Movant States without providing them a chance to supply that adversarial presentation, this Court should grant intervention as of right (or in the alternative permissive intervention) to defend the constitutionality of 18 U.S.C. § 1715.

## **BACKGROUND**

### A.  **Section 1715.**

Under 18 U.S.C. § 1715 ("Section 1715"), which has been continuously in effect since 1927, "[p]istols, revolvers, and other firearms capable of being concealed on the person are nonmailable and shall not be deposited in or carried by the mails or delivered by any officer or employee of the Postal Service." Section 1715 contains express exceptions allowing the shipment of such firearms via the Postal Service to the military and to federal law enforcement agencies, and to bona fide firearms dealers and manufacturers "in customary trade shipments" such as "articles for repairs or replacement of parts." *Id.* The exception for shipments between federal firearms licensees ("FFLs") means that members of the public *can* send firearms by mail, so long as they use FFLs as an intermediary. *See* Pls.' LCvR 56 Statement ¶ 11; Shreve Decl., ECF No. 25-1 ¶ 9.

The recipient would need to pick up the handgun at an FFL to whom the gun may be mailed, *see id.*, and that FFL would conduct any background check required by federal or state law. *See, e.g.,* 18 U.S.C. § 922(t); 18 Pa. Cons. Stat. § 6111 (2019). As Plaintiffs acknowledge, that means Section 1715 does not bar Shreve from mailing a handgun to her father, but simply adds about $80 to the cost of doing so: Plaintiffs estimate that mailing it directly to her father would cost $20, while shipping the handgun via an FFL in accordance with the statute would cost between $60-100 (split halfway between sender and recipient). Pls.' LCvR 56 Statement ¶ 11; Shreve Decl., ECF No. 25-1 ¶¶ 7–9.

Section 1715 also does not prohibit private carriers from shipping firearms. Instead, Section 1715 restricts only the Postal Service's ability to make shipments—consistent with the statute's purpose "to avoid having the Post Office serve as an instrumentality for the violation of local laws which prohibited the purchase and possession of weapons," *Powell*, 423 U.S. at 91 (citing H. R. Rep. No. 610, 69th Cong., 1st Sess. (1926)), and "to make it more difficult for criminals to obtain concealable weapons," *id.* (citing 66 Cong. Rec. 726 (1924)); *see also Carrying of Pistols, Revolvers, and Other Firearms, Capable of Being Concealed on the Person in the Mails: Hearing on H.R. 4502 before the H. Subcomm. on the Post Office and Post Roads*, 69th Cong. 2 (Feb. 17, 1926) (Section 1715's sponsor agreeing the law's purpose "was to make pistols nonmailable to a town, a county, or State against the laws or ordinances and regulations of the political subdivisions of the State"). For good reason: while federal statutes separately regulate firearm shipments by persons, Federal Firearms Licensees (FFLs), and common or contract carriers to ensure such firearms cannot be mailed to prohibited persons, *see generally* 18 U.S.C. § 922, USPS does not understand itself to be a common carrier. So shipments made through USPS would not fall within that law, and would not be subject to those additional restrictions. *See also* 18 U.S.C. § 922(e)

(prohibiting persons from "knowingly … deliver[ing] to any common or contract carrier" arms for prohibited persons); *id.* § 922(f)(1) (prohibiting common carriers from transporting firearms in interstate commerce knowing, or having reasonable cause to believe, the transport would be in violation of another part of section 922); *id.* § 922(f)(2) (prohibiting common carriers from transporting firearms in interstate commerce without getting written acknowledgment from the recipient). As directed by Section 1715, USPS has promulgated regulations which define "handguns," confirm that handguns are nonmailable except in circumscribed circumstances, and require nonmailable firearms discovered by USPS to be reported to the United States Postal Inspection Service (USPIS). *See* U.S. Postal Serv. Publ'n 52 §§ 431.2, -432.2, -435 (2025) (Publication 52).

**B.  This Case And The Federal Government's Non-Defense Announcement.**

On July 14, 2025, Plaintiffs Bonita Shreve, Gun Owners of America (GOA), and Gun Owners Foundation (GOF) filed this action against USPS, USPIS, and the Postmaster General, Chief Postal Inspector, and Department of Justice (DOJ) ("Federal Defendants"). Plaintiffs allege that Section 1715 and USPS's implementing regulations violate the Second Amendment. *See* Compl. ¶¶ 11–12, ECF No. 1. Federal Defendants' initial response to the suit was to seek to file a dispositive motion, with no indication that they would decline to defend the statute's validity. ECF 15 & 17. Plaintiffs moved for summary judgment on December 18, 2025, seeking judgment in their favor on their Second Amendment claim and an injunction preventing Defendants from enforcing Section 1715 and its implementing regulations. *See* ECF 24.

On January 15, 2026—the day before Federal Defendants' cross-motion was due—DOJ's Office of Legal Counsel (OLC) issued a Memorandum Opinion, entitled "Constitutionality of 18 U.S.C. § 1715," which for the first time "conclude[d] that the restriction imposed by section 1715 violates the Second Amendment." 49 Op. O.L.C. (Jan. 15, 2026) (slip op. at 2) ("OLC Memo"). Although DOJ affirmed that USPS could continue to "enforce the shipping restrictions found in

section 1715 against firearms that lack constitutional protection" at all, the OLC Memo declared for the first time that the statute is "unconstitutional as applied to constitutionally protected arms." *Id.* at 11–12. The OLC Memo further specifically referenced the instant action, noting that "the scope of [this] case is uncertain," but nonetheless stating that "[t]he People's constitutional rights should not be abridged while awaiting the outcome of that case." *Id.* at 15. And so, it concluded, "the Executive Branch may not, consistent with the Constitution, enforce section 1715 with respect to constitutionally protected firearms, and the Postal Service should modify its regulations to conform with the scope of the Second Amendment as described in this opinion." *Id.*

The next day, January 16, the Federal Defendants filed a combined opposition to Plaintiffs' motion and cross-motion for summary judgment, arguing the complaint should be dismissed on standing and ripeness grounds. *See* ECF 27. They represented that the OLC Memo was "binding on the executive branch," meaning that they "cannot prosecute Shreve … for shipping her Bersa .380 to her father." *Id.* at 12. Their brief did not address Plaintiffs' arguments on the constitutionality of Section 1715 whatsoever, effectively conceding based upon the OLC Memo that Section 1715 "operates as a substantial burden on citizens' Second Amendment rights," and stating that DOJ would "cease prosecutions under the statute with respect to protected arms." *Id.* at 1.

Movant States became aware of Federal Defendants' non-defense position through publicity surrounding the OLC Memo and quickly sought to intervene. Movant States filed a notice of intent to move to intervene on February 5, 2026, ECF 31, advising of their intent to seek intervention and to file an accompanying motion for summary judgment/opposition to Plaintiffs' motion for summary judgment. Movant States asked this Court to set a briefing schedule for the intervention motion, which this Court did, ordering them to file their motions by March 2. ECF 41.

**ARGUMENT**

Federal Defendants correctly argue that Plaintiffs' claims should be dismissed on threshold procedural grounds. But to the extent this Court finds the claims justiciable and reaches the constitutional merits, it should grant Movant States' intervention to defend Section 1715's constitutionality to ensure adversarial briefing on the Second Amendment issue. This Court should grant Movant States' intervention as of right because Plaintiffs' requested relief enjoining Section 1715 would directly injure Movant States' interests in multiple ways; the Federal Defendants no longer adequately represent those interests; and intervention is timely. *See* Fed. R. Civ. P. 24(a)(2). In the alternative, this Court should grant Movant States permissive intervention.

## II.    MOVANT STATES ARE ENTITLED TO INTERVENE AS OF RIGHT.

Under Rule 24(a), a movant seeking intervention as of right must have "a timely application for leave to intervene" establishing "a sufficient interest in the underlying litigation … [that] will be impaired or affected by the disposition of the action," and must demonstrate "that the existing parties to the action do not adequately represent the prospective intervenor's interests." *Liberty Mut. Ins. Co. v. Treasdale, Inc.*, 419 F.3d 216, 220 (3d Cir. 2005). "[T]he flexibility and spirit of Rule 24" encourages courts to give intervenors "the opportunity to present their positions." *Kleissler v. United States Forest Serv.*, 157 F.3d 964, 971 (3d Cir. 1998). And the Third Circuit has expressed a "policy preference which, as a matter of judicial economy, favors intervention over subsequent collateral attacks." *Id.* at 970 (quoting *Brody ex rel. Sugzdinis v. Sprang*, 957 F.2d 1108, 1123 (3d Cir. 1992)). Indeed, "Rule 24(a) is to be liberally construed in favor of intervention." *N.L.R.B. v. Frazier*, 144 F.R.D. 650, 655 (D.N.J. 1992).

Each consideration compels granting intervention as of right: this litigation threatens to impair Movant States' substantial interests; Federal Defendants no longer adequately represent those interests; and Movant States' motion is swift and timely. Intervention is proper here.

A.  **Movant States Have Substantial Interests That Would Be Impaired If Plaintiffs Obtain The Relief They Seek.**

Movant States' interests would be significantly impeded by declaratory or injunctive relief holding Section 1715 unconstitutional under the Second Amendment. To justify intervention as of right, a litigant must demonstrate significant "interest[s] in the resolution of [the] lawsuit that may be practically impaired or impeded without their participation." *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 191 (2022); *see also Liberty Mutual*, 419 F.3d at 220 (the movant must show "a tangible threat to a legally cognizable interest" (citation modified)); *Brody*, 957 F.2d at 1123 ("[T]his factor may be satisfied if, for example, a determination of the action in the applicants' absence will have a significant stare decisis effect on their claims, or if the applicants' rights may be affected by a proposed remedy."). Although there is no "precise and authoritative definition of the interest that satisfies Rule 24(a)(2)," *Kleissler*, 157 F.3d at 969 (citation modified), a qualifying interest is one that is "specific to them, is capable of definition, and will be directly affected in a substantially concrete fashion by the relief sought," and is not "remote or attenuated," *id.* at 972. Movant States amply establish sufficient interests because the final relief Plaintiffs request—including a declaration that Section 1715 is unconstitutional and an injunction prohibiting the statute's enforcement in all respects—would harm Movant States' interests in multiple ways.

a. <u>Pocketbook Injury</u>. If this Court issues a judgment in Plaintiffs' favor, Movant States will suffer direct pocketbook harms. Those harms would result from increased state law enforcement costs and increased administrative costs and burden, since concealable firearms could now be mailed through USPS to individuals who are not legally authorized to receive.

As an initial matter, direct pocketbook injuries of this nature are the kinds of injuries that can give rise to a protectible interest under Rule 24(a). *See, e.g.*, *Kleissler*, 157 F.3d at 972–74 (recognizing that economic consequences, when "more than mere[ly] attenuated," qualify as an

interest for purposes of Rule 24(a)); *Nat'l Parks Conservation Ass'n v. EPA*, 759 F.3d 969, 976 (8th Cir. 2014) ("economic interests" in a lawsuit "satisfy Rule 24(a)(2)'s recognized-interest requirement" (citing *Kleissler*, 157 F.3d at 972)); *accord Biden v. Nebraska*, 600 U.S. 477, 490 (2023) (recognizing that States suffer concrete and cognizable Article III injuries when they suffer "financial harm"); *Gen. Land Office v. Biden*, 71 F.4th 264, 274 (5th Cir. 2023) (holding that States have an "interest in [their] fiscal policy" that suffers when States must "redirect resources" due to changes in federal policy); *State v. Biden*, 10 F.4th 538, 547–48 (5th Cir. 2021) (finding increased "correctional costs" from a probable increase in crime to be a "cognizable, imminent injury"); *New Jersey v. EPA*, 989 F.3d 1038, 1046 (D.C. Cir. 2021) (recognizing that "exacerbated administrative costs and burdens imposed by" an EPA rule upon States constitute "a concrete and particularized injury").

*California v. ATF*, 718 F. Supp. 3d 1060 (N.D. Cal. 2024), *appeal docketed*, No. 24-2701 (9th Cir. April 29, 2024), is illustrative. In describing the higher showing of interest needed to establish Article III standing, the court held that California had standing to challenge gaps in how the federal government regulates ghost guns based on the State's resulting "increased cost of policing and law enforcement." *Id.* at 1073–74, 1077–78. The court reasoned that the federal rules allowed individuals to avoid regulation by obtaining partially-complete firearms that are not traceable yet require minimal steps to assemble into a functional gun, and that "it is entirely predictable that crimes involving such guns will occur and thereby injure the state." *Id.* at 1075. The kind of increased law enforcement costs from individuals having unregulated access to firearms that satisfies Article III's higher bar thereby amply satisfies the lower burden required for intervention. *See Pennsylvania v. President United States of Am.*, 888 F.3d 52, 57 n.2 (3d Cir. 2018); *see also Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 663, 665 (2019) (noting an intervenor can

satisfy test for intervention without independently establishing Article III standing where intervenor seeks same relief as an existing defendant).

Pocketbook injuries like these would directly result from the Plaintiffs receiving the relief they request in this case, because numerous individuals would then be able to use USPS to circumvent various restrictions that the Movant States place on firearms possession and transfer. For example, New Jersey law limits the possession of most firearms to those who do not "pose a danger to self or others" or who are not otherwise statutorily barred. N.J. Stat. Ann. § 2C:58-3(c); *see also* N.Y. Penal Law § 400.00(1)(b); Del. Code Ann. tit. 11, § 1448 (a) (prohibiting "purchasing, owning, possessing, or controlling" most firearms in Delaware by certain persons who have been involuntarily committed as well as those who have been convicted of felonies, crimes of violence, and certain drug crimes). To effectuate those restrictions, New Jersey requires that individuals obtain a Firearms Purchaser Identification Card (FPIC) or Permit to Purchase a Handgun (HPP) to legally purchase or obtain a handgun and certain other firearms, and the issuance of those items is predicated upon the applicant reviewing a basic firearms safety course, being fingerprinted, and undergoing an individualized background search by the local police department or New Jersey State Police that reviews their criminal history, mental health history, previous applications, letters of reference, and other material. *See* N.J. Stat. Ann. § 2C:58-3; *cf.* N.Y. Penal Law § 400.00(1), (4); Del. Code Ann. tit. 11, § 1448D (h)–(i). And because careful scrutiny at the point of sale or transfer is the most effective way of ensuring only non-dangerous individuals legally access handguns, Declaration of Eric Barlow ("Barlow Decl.") at ¶ 21; *see also id.* at ¶¶ 8–20, Movant States' laws require that transfers of handguns—whether sale, purchase, gift or other transfers—be conducted through a licensed retailer, *see* N.J. Stat. Ann. § 2C:58-3(a)(2); Del. Code Ann. tit. 11, § 1448A(a); Del. Code Ann. tit. 11, § 1448D; N.Y. Gen. Bus. Law § 898. Yet if Plaintiffs obtain

their relief, USPS will suddenly become a simple and readily-available mechanism that individuals could use to circumvent these transfer restrictions. Barlow Decl. at ¶¶ 23–24; Declaration of Michael W. Deyo ("Deyo Decl.") at ¶¶ 14–20; Declaration of Col. William D. Crotty ("Crotty Decl.") at ¶¶ 16–19, 47.[1]

And Plaintiffs' requested relief would impose further costs on Movant States because these States limit the types of concealable firearms that may be possessed—including ghost guns, *see* N.J. Stat. Ann. § 2C:39-3(n); N.Y. Penal Law §§ 265.60–64; short-barreled rifles, *see* N.J. Stat. Ann. §§ 2C:39-1(o), -3(b); N.Y. Penal Law § 265.00(3)(c); Del. Code Ann. tit. 11, § 1444(a)(4), firearm silencers, *see* N.J. Stat. Ann. § 2C:39-3(c); N.Y. Penal Law § 265.02(2); Del. Code § Ann. tit. 11, § 1444 (3), and assault firearms, *see* N.J. Stat. Ann. § 2C:39-5(f); N.Y. Penal Law §§ 265.02(7), 265.00(22); Del. Code Ann. tit. 11, §1466. Yet the current USPS regulations define "handgun" broadly to include any rifle under 16 inches, shotgun under 18 inches, or altered shotgun or rifle under 26 inches. Publication 52, § 431.2 (b). Such rifles and shotguns constitute "sawed-off shotguns" under New Jersey law and are prohibited in the state. N.J. Stat. Ann. §§ 2C:39-1(o), -3(b); *see also* Del. Code Ann. tit. 11, § 1444(c)(3) (same). The USPS definition of "firearm" also includes "any firearm muffler or firearm silencer," placing at issue the mailability of those attachments as well. Publication 52, § 431.1(a). In addition, at least three classes of

---

[1] Similarly, New Jersey law limits the number of handguns that may be purchased to one per person in a thirty-day period. N.J. Stat. Ann. § 2C:58-3(i). New York City likewise limits the acquisition of multiple firearms to one per person per ninety days. N.Y.C. Admin. Code § 10-302.1. When handgun transfers go through licensed retailers (as New Jersey and New York State laws require), this provision is readily enforced because licensed retailers access the relevant state databases before completing transactions, and must refuse to sell handguns to individuals who exceed this purchasing limit. Barlow Decl. at ¶¶ 17–20; N.Y.C. Admin. Code § 10-302.1(c)–(d); *see also* Deyo Decl. at ¶ 15. But when individuals are able to use the U.S. mail to transfer handguns, they have an available mechanism that lets them bypass these licensed retailers, and thereby evade state and local restrictions on gun sales—again leading to greater costs for the states to enforce their laws. Barlow Decl. at ¶¶ 21–29; Deyo Decl. at ¶¶ 14–20.

weapon—the TEC-9, TEC-22, and Uzi-type semiautomatic guns, along with all substantially iden-tical firearms—are banned in New Jersey as "assault firearms" but would be suddenly mailable through USPS if Section 1715 were no longer in effect. N.J. Stat. Ann. § 2C:39-1(w); Barlow Decl. at ¶ 26; *see also* N.Y. Penal Law § 265.00(22)(c) (including certain similar pistols in the definition of prohibited assault weapons). So not only would prohibited persons have a new way to obtain firearms in violation of state law, but those prohibited persons would suddenly have new paths to access this series of prohibited firearms as well.[2]

An injunction ordering USPS to suddenly be available for the mailing of firearms would disrupt these careful regulatory systems. For one, as a practical matter, the entire premise of the federal government's new position is that there is no other mail carrier available to facilitate inter-state mailing other than via an FFL, *see* OLC Memo at 1 (determining that "major express services currently forbid all persons from shipping firearms, except for some federal firearms licensees that have private shipping agreements"), which means that interstate transfers by mail must in practice be complying with the state laws that govern those FFLs—unless and until an injunction requires USPS to provide these services too. For another, as a statutory matter, even where private carriers do choose to transport firearms by mail, they are subject to a series of important statutory safety measures. *See, e.g.*, 18 U.S.C. § 922(e) (requiring persons who present package to a common car-rier for transportation in interstate commerce to provide written notice that the package contains a firearm, unless the shipment is to an FFL); *id.* § 922(f)(2) (ensuring common carriers must also

---

[2] Nor is it dispositive that these prohibited persons would still be violating state law. The fact that the third party's action would itself be unlawful does not vitiate Article III *standing* when it is a "predictable" result of the challenged action, *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) (finding the States' loss of federal funding to be an injury traceable to placement of a citizenship question on the Census where "third parties will likely react in predictable ways" by not responding to the Census, "even if they do so unlawfully"), and demonstrating Article III standing is often a higher bar than establishing an affected interest for intervention as a defendant.

obtain written acknowledgment from the recipient that they received a firearm); *id.* § 922(f)(1) (putting a prohibition on common carriers, not just the individual shippers or recipient, not to ship firearms in interstate commerce that violate federal laws). But OLC has concluded that USPS is not a common carrier, *see* OLC Memo at 12, so those protections would evidently not apply. That presented no problems when Section 1715 remained in effect, but an order enjoining enforcement of the law and putting USPS into this market would seemingly come without those precautions. And finally—but crucially—unlike common carriers like UPS, DHL, and Federal Express, USPS has no statutory obligation to ensure the packages it carries comply with state laws on the acquisition or transfer of firearms. Indeed, USPS would no doubt claim intergovernmental immunity from any state actions seeking to require compliance in shipments with their state laws. *See, e.g.*, *United States v. Washington,* 596 U.S. 832, 835 (2022) (discussing doctrine). So while the States could still bring actions against individuals who ship or receive firearms unlawfully, they cannot count on the key tool of going after the shipper that facilitated systematic violations of their laws.

The threatened costs and burdens on state law enforcement as a result are substantial. Indeed, state law enforcement will have to create an entirely new investigative and tracking structure to account for the unregulated mailing of concealable firearms through USPS, including the costs of personnel, infrastructure, training and deployment. Barlow Decl. at ¶¶ 50–55; Deyo Decl. at ¶¶ 17, 21; Crotty Decl. at ¶¶ 40–42. And because concealable firearms can be shipped virtually anonymously, bypassing the use of FFLs, this would significantly hamper not just efforts to ensure compliance with Movant States' laws at the point of transfer, but also criminal investigations that rely upon systems like eTrace which can identify the FFL that sold a given firearm and the individual who purchased it from the FFL. Barlow Decl. at ¶¶ 30–49; Deyo Decl. at ¶¶ 17, 22; Crotty Decl. at ¶¶ 28, 32. By way of example, in 2023, eTrace successfully identified a crime firearm's

purchaser and source state in 68% of searches in New York, *see* U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Trace Data: New York – 2023*, https://www.atf.gov/firearms/report/firearms-trace-data/firearms-trace-data-new-york-2023 (last visited Mar. 2, 2026) ("*Firearms Trace Data: New York – 2023*"), 69% of searches in New Jersey, Barlow Decl. at ¶ 35, and 79% of searches in Delaware, Crotty Decl. at ¶ 28. If concealable firearms can circumvent FFLs through the USPS mail, state law enforcement will have a reduced probability of identifying the path a gun traveled before it was used in the crime. Barlow Decl. at ¶¶ 36–38; Deyo Decl. at ¶ 17; Crotty Decl. at ¶ at 32. And even more critically, the vast majority of crime guns recovered in New York and New Jersey—81% and 79%, respectively—are traced to out-of-state FFLs. Barlow Decl. at ¶ 39; Deyo Decl. at ¶ 16; *Firearms Trace Data: New York – 2023*. By providing an easy method to circumvent FFLs, Movant States' law enforcement will be subject to firearms trafficking and the associated increase in monitoring, investigating and prosecuting those cases. Barlow Decl. at ¶¶ 40–49; Deyo Decl. at ¶¶ 17, 21–22; Crotty Decl. at ¶¶ 32–33. It will also require law enforcement in Movant States to undertake more expensive and time-consuming methods to generate investigative leads to identify the source of a crime gun, including in-person interviews, long term surveillance operations of suspects, out-of-state travel to interview trafficking suspects, and coordinated interview or surveillance operations in and out of Movant States. Barlow Decl. at ¶¶ 40–49; Deyo Decl. at ¶¶ 21–22; Crotty Decl. at ¶¶ 32–33.

      The problem is especially acute as it relates to Movant States' restraining-order regimes, which ensure that a person who is in a mental health crisis or subject to a domestic-violence restraining order can no longer have firearms. *See, e.g.*, Extreme Risk Protective Order Act ("ERPO Act"), N.J. Stat. Ann. §§ 2C:58-20 to -32; Prevention of Domestic Violence Act ("PDVA Act"), N.J. Stat. Ann. §§ 2C:25-17 to -35; N.Y. Crim. Pro. Law § 530.14; Del. Code Ann. tit. 10, § 7704;

Del. Code Ann. tit. 11, § 1448 (a)(6), -(a)(7). Under New Jersey's ERPO Act, for instance, law enforcement officers or family members can seek a court order temporarily preventing a person from possessing firearms if they are found to pose a danger to themselves or others by having firearms. N.J. Stat. Ann. § 2C:58-23(e). A law enforcement affidavit supporting an ERPO petition must explain the officer's reason for believing the person has firearms in the home or location to be searched, *id.* § 2C:58-23(b). But while law enforcement will know if the person has a firearm they received through an FFL (which must record such transactions, *see* 18 U.S.C. § 923(g); 27 C.F.R. § 478.124), they will not know of any firearms the person obtained via USPS—and thus is less likely to support an ERPO petition in those cases, undermining the ERPO Act's enforcement. Notably, the harm materializes even if the person otherwise lawfully could possess firearms (as the person could before the domestic violence or ERPO order issued)—underscoring that the harm to States even goes beyond criminal actors.

Movant States will thus suffer direct harms to their state fiscs in the form of increased state law enforcement costs directly related to mailability of concealable firearms through USPS if Section 1715 is found unconstitutional and Plaintiffs obtain their requested relief.

b. <u>Sovereign Interest</u>. Plaintiffs' demanded relief also jeopardizes Movant States' substantial sovereign interests in the integrity and effective enforcement of their state laws. States clearly have a sufficient interest, for purposes of intervention, in ensuring the enforcement of "any [state] laws that do not conflict with federal law." *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 277 (2022); *see also Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982) (identifying "power to create and enforce a legal code" as a sovereign interest); *Dep't of Lab. v. Triplett*, 494 U.S. 715, 719 (1990) (interest in enforcement of state law sufficient). After all, the "violation of [a government's] law" constitutes an "injury to its sovereignty," *Vt.*

14

*Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000), particularly as to the enforcement of its own criminal laws, *see Harper v. Pub. Serv. Comm'n*, 396 F.3d 348, 354 (4th Cir. 2005).

If Section 1715 is declared unconstitutional, the resulting gap in the federal regulations will spark a flood of concealable arms mailed into the Movant States, sharply impairing the integrity of Movant States' regulatory schemes. For one, as explained above, that is because USPS has no statutory obligation to ensure that the packages it transports comply with state laws that regulate the transfer of firearms and keep them out of the hands of persons the State prohibits from having firearms, even if federal law does not. *See supra* at 12. Indeed, USPS would no doubt claim immunity if a State ever attempted to require it to comply with state prohibited-person laws, unlike the lawsuits that a State could bring against private common carriers. *See supra* at 12 (discussing intergovernmental immunity doctrine). This helps explain why Section 1715 itself is animated by Congress's desire "to avoid having the Post Office serve as an instrumentality for the violation of local laws which prohibited the purchase and possession of weapons." *Powell*, 423 U.S. at 91. So the injunction Plaintiffs demand would have the exact opposite effect—turning USPS into a tool for violating state sovereign laws, a problem the States have fewer tools than usual to address.

There is also a sovereign harm from the requested injunction because when individuals can use the mail to ship firearms, they have a readily-accessible mechanism for transferring firearms across large distances that bypasses FFLs. Indeed, under the status quo, FFLs shoulder the burden of confirming compliance with state and federal law. 18 U.S.C. § 922(b)(2), (t)(1). This includes the referral of each transferee for a background check, 18 U.S.C. § 922(t)(1), and the verification that state law permits such transferee to own the particular weapon mailed, *see* 27 C.F.R. § 478.99(b)(2) (2025). If this Court finds Section 1715 unconstitutional and grants Plaintiffs their

15

requested relief, there will be no statute or regulation which obligates USPS to ensure that all mailed handguns pass through FFL intermediaries to lawfully permitted recipients. Persons within and without Movant States could directly mail ghost guns, assault firearms under 16 inches, short-barreled rifles, and firearm silencers through the Postal Service all in violation of state law. *See supra* at 10–11. And because Movant States' laws require that the vast majority of all handgun transfers occur through licensed retail dealers, *see* N.J. Stat. Ann. § 2C:58-3(a)(2); N.Y. Gen. Bus. Law § 898; Del. Code Ann. tit. 11, §§ 1448A(a), 1448D, an adverse decision here will cripple Movant States' regulations of legal handguns as well. Indeed, in New Jersey alone over 1,700 persons were denied a FPIC or HPP or denied at a point-of-sale background check in 2025—whether because they have a felony conviction, are subject to a domestic violence temporary restraining order, or meet some other disqualifier—but enjoining Section 1715 would give those prohibited-persons a means to evade those state laws and background checks by receiving firearms via the Postal Service. Barlow Decl. at ¶ 22.

Moreover, Movant States' regulatory frameworks will be substantially impaired if this Court adopts DOJ's position that Section 1715 is unconstitutional to the extent that it impacts "constitutionally protected firearms." OLC Memo at 2. After all, Federal Defendants are bound by OLC Memo, so the scope of their implementation of Section 1715 would be dictated by their own unilateral positions regarding which arms are constitutionally protected—even though those positions conflict with Movant States' in multiple areas. For example, just last year, DOJ argued that firearm silencer bans—which all three Movant States enforce, *see* N.J. Stat. Ann. § 2C:39-3(c); N.Y. Penal Law § 265.02(2); Del. Code Ann. tit. 11, § 1444(a)(3)—are unconstitutional. *See* Br. for United States as Amicus Curiae at 24 n.10, *Barnett v. Raoul*, No. 24-3060, ECF No. 83 (7th Cir. June 13, 2025); Government's Supp. Resp. to Pet. for Reh'g En Banc at 1, *United States v.*

*Peterson*, No. 24-30043, ECF No. 135 (5th Cir. May 29, 2025). That means USPS would suddenly be available to ship these silencers directly into States despite these prohibitions—and, as explained above, at least USPS itself could claim intergovernmental immunity from state actions to block it from continuing to violate those firearms laws. *See supra* at 12. DOJ likewise recently argued that New Jersey's assault weapons ban is unconstitutional—a law that covers some concealable arms that fall within Section 1715's sweep. *See* Br. for United States as Amicus Curiae at 4, *ANJRPC v. Att'y Gen. N.J.*, No. 24-2415, ECF No. 95 (3d. Cir. Sept. 18, 2025). And DOJ has argued that Illinois law unconstitutionally restricts possession of the TEC-9, TEC-22, and Uzi pistols, all of which are prohibited "assault firearms" under New Jersey's law. *See* Br. for United States as Amicus Curiae at 6–7, *Barnett v. Raoul*; *compare* 720 Ill. Comp. Stat. 5/24-1.9(a)(1) (Illinois "assault weapon" definition and list), *with* N.J. Stat. Ann. § 2C:39-1(w) (New Jersey "assault firearm" definition and list). In other words, a ruling adopting DOJ's position as to the permissible scope of Section 1715 would directly enable mailing of certain firearms into Movant States that Movant States have prohibited by their own state criminal laws—a clear sovereign harm.

**B. Existing Parties No Longer Adequately Represent Movant States' Interests.**

Because the federal government (through the OLC Memo) has announced that it no longer views Section 1715 as constitutional on the merits, and because Federal Defendants have declined to defend the statute on the merits in their summary judgment briefing, the existing Defendants no longer adequately represent Movant States' interests. This Court should thus allow Movant States to intervene to provide the defense of Section 1715 that no other party will provide.

Inadequate representation can be present, among other circumstances, when the interests of movant and party "diverge sufficiently that the existing party cannot devote proper attention to the applicant's interests," or when "the representative party is not diligently prosecuting the suit."

*United States v. Territory of V.I.*, 748 F.3d 514, 519–20 (3d Cir. 2014). "The requirement of the Rule is satisfied if the applicant shows that representation of his interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972); *accord Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 368 (3d Cir. 1995). "The possibility that the interests of the applicant and the parties may diverge 'need not be great' in order to satisfy the minimal burden." *Am. Farm Bureau Fed'n v. E.P.A.*, 278 F.R.D. 98, 110 (M.D. Pa. 2011) (quoting *Utah Ass'n of Counties v. Clinton*, 255 F.3d 1246, 1254 (10th Cir. 2001)).

The inadequacy of representation is obvious here. The quintessential case for intervention is one in which the federal government has "abandoned any defense" of the challenged policy. *DeOtte v. Nevada*, 20 F.4th 1055, 1070 (5th Cir. 2021); *see also California v. Texas*, 593 U.S. 659, 668 (2021) (noting without objection that a coalition of States intervened to defend the Affordable Care Act after the federal government declined to do so). Indeed, the Third Circuit has recognized that a federal agency is no longer able to provide adequate representation for a movant's interests based on nothing more than (1) a prior litigation decision not to appeal an adverse decision that gave the movants "legitimate pause to [their] confidence" in the federal government's adequacy, (2) and the mere possibility of "unanticipated policy shifts" that would produce a further divergence of interests between the government defendant and intervenor. *Kleissler*, 157 F.3d at 973–74. Here, by contrast, there is not merely the risk that the Federal Defendants would decline to appeal an adverse decision—instead, the Federal Defendants are declining to defend the statute on the merits even in this Court. Moreover, far from a fear of future policy changes, the federal government's shift is concrete, and their already-filed summary judgment brief relies solely on procedural arguments, with no substantive defense. *See generally* ECF No. 27. Since no existing party

18

will argue in defense of the constitutionality of Section 1715, Movant States' interests will be wholly unrepresented (and this Court will lack on-point briefing) if this Court reaches the merits question.

The "presumption of adequate representation" is likewise inapplicable. *Territory of the V.I.*, 748 F.3d at 520. The Third Circuit presumes adequacy if "one party is a government entity charged by law with representing the interests" of the putative intervenor. *Brody*, 957 F.2d at 1123. But Federal Defendants are not "charged by law" with representing Movant States' interests. *Id.* "Where 'the absentee's interest is similar to, but not identical with, that of one of the parties,' that normally is not enough to trigger a presumption of adequate representation." *Berger*, 597 U.S. at 197 (quoting 7C Wright & Miller's Federal Practice and Procedure § 1909 (3d ed. Supp. 2022)). And where, as here, "Defendants have abandoned any defense" of the challenged policy on the merits, Movant States have a "heightened" interest in defending the statute. *DeOtte*, 20 F.4th at 1070. This interest is particularly acute in the context of Second Amendment litigation, where "[c]ourts are . . . entitled to decide a case based on the historical record compiled by the parties." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 25 n.6 (2022). Where a challenge implicates the Second Amendment, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *id.* at 19, but where the government fails to defend its law, the court is left to make a historical determination without any history before it. Movant States' participation fulfills the "very purpose of intervention" and allows these States "to air their views so that a court may consider them before making potentially adverse decisions." *Brumfield v. Dodd*, 749 F.3d 339, 345 (5th Cir. 2014).

C.  **Movant States' Swift Intervention Is Timely.**

This motion is timely. The Third Circuit evaluates the timeliness of an intervention motion based on three factors: "the stage of the proceeding," "the prejudice that delay may cause the parties," and "the reason for the delay." *Mountain Top*, 72 F.3d at 369; *see also Cameron*, 595 U.S. at 279 ("'[T]imeliness is to be determined from all the circumstances,' and 'the point to which [a] suit has progressed is ... not solely dispositive.'") (quoting *NAACP v. New York*, 413 U.S. 345, 365–66 (1973)). "There is a general reluctance to dispose of a motion to intervene as of right on untimeliness grounds because the would-be intervenor actually may be seriously harmed if not allowed to intervene." *Benjamin ex rel. Yock v. Dep't of Pub. Welfare of Pa.*, 701 F.3d 938, 949 (3d Cir. 2012). Indeed, timeliness is particularly likely to favor intervention if movants act promptly upon their interests no longer being adequately represented by the existing parties. *See Cameron*, 595 U.S. at 279–80 (noting "the [state] attorney general's need to seek intervention did not arise until the secretary ceased defending the state law, and the timeliness of his motion should be assessed in relation to that point in time").

The procedural history of this case demonstrates conclusively that Movant States acted in a timely fashion because they acted swiftly upon learning that the federal government would not in fact represent their interests. When Plaintiffs first filed this case, there was no reason to believe that the federal government would decline to defend the statute on the merits—it had not yet indicated any concerns about the constitutionality of its century-old law. To the contrary, the federal government did not issue the OLC Memo until January 15, 2026—*one day* before Federal Defendants' summary judgment brief was due. Movant States then formally notified this Court of their intent to intervene and asked this Court to set a briefing schedule for their intervention motion a mere three weeks later—on February 5, 2026. This Court promptly did so, and ordered the Movant States to file their Motion to Intervene and their opening summary judgment brief by March 2,

2026. Movant States have now complied, filing both motions by the date this Court ordered. So less than one month after the federal government announced its new view of Section 1715, the States sought to intervene, and less than one month later, filed full merits briefing. Timeliness is accordingly clear.

That point is reinforced by 28 U.S.C. § 530D. Under Section 530D, if DOJ declines to defend a federal statute "in any judicial" proceeding because it believes that statute "is unconstitutional," it must submit a report to Congress "within such time as will reasonably enable" either body "to take action, separately or jointly, to intervene in timely fashion in the proceeding, but in no event later than 30 days after" the DOJ's declination. 18 U.S.C. §§ 530D(a)(1)(B)(ii), (2), (b)(2). Yet as of the date Movant States noticed their intent to intervene, DOJ had not yet filed any letter with Congress about this case—strongly indicating the federal government believed there was still sufficient time for other interested parties "to intervene in timely fashion in the proceeding." *Id.* § 530D(b)(2); *see also* U.S. Dept. of Justice, Office of Information Policy, *Letters Submitted to Congress Pursuant to 28 U.S.C. § 530D*, https://www.justice.gov/oip/letters-submitted-congress-pursuant-28-usc-%C2%A7-530d (last visited Mar. 2, 2026).

The timeliness of this motion also stands in sharp contrast to cases in which States' motions to intervene to defend federal policies were denied as untimely. *See, e.g.*, *Cook Cnty., Ill. v. Texas*, 37 F.4th 1335, 1337, 1342 (7th Cir. 2022) (affirming denial of intervention filed over six months after district court vacated federal regulation being challenged, four months after the new President took office, and two months after his Administration had dismissed appeals defending the regulation in other courts across the country); *Huisha-Huisha v. Mayorkas*, No. 22-5325, 2022 WL 19653946, at *1–2 (D.C. Cir. Dec. 16, 2022) (States not permitted to intervene in defense of policy where district court already vacated the policy and movants had been submitting filings in other

courts for more than a year indicating that they could not rely on federal defendants to defend the policy). Unlike in those cases, here there is no ruling on the merits, and up until OLC issued its opinion, Movant States had no reason to believe that the federal government would decline to vigorously defend Section 1715 on the merits. *Cf. Cameron*, 595 U.S. at 279–80 (intervention timely where Kentucky Attorney General moved "as soon as it became clear" that the existing parties would not continue defending a statute that had been declared unconstitutional by appellate court).

Finally, concerns about prejudice likewise support intervention here. Consistent with the speed at which Movant States intervened and the swift briefing schedule this Court already entered, neither Plaintiffs nor the Federal Defendants could plausibly suffer any prejudice to the progress of this case from intervention. After all, Movant States have filed a summary judgment brief simultaneous with the filing of this intervention brief—allowing summary judgment to proceed apace and ensuring Plaintiffs have an opportunity to respond to the merits of the Second Amendment issue in their summary judgment reply brief—simultaneously with their response to the Federal Defendant's standing-based defenses. *See, e.g.*, *Wallach v. Eaton Corp.*, 837 F.3d 356, 378 (3d Cir. 2016) (noting the prejudice inquiry turns on whether "there was … significant delay from which prejudice could stem"); *Sierra Club v. Espy*, 18 F.3d 1202, 1206 (5th Cir. 1994) ("prejudice must be measured by the delay in seeking intervention, not the inconvenience to the existing parties of allowing the intervenor to participate in the litigation"). By contrast, Movant States would suffer enormous prejudice were they prohibited from intervening at this stage of the case—as there would be no other party defending the statute on the merits, *see supra* at Part I.B, notwithstanding their enormous sovereign and practical interests in its existences, *see supra* at Part I.A.

This motion is thus timely and granting intervention would allow Movant States to provide the fulsome defense of the federal statute that the Federal Defendants no longer will—ensuring this Court's decision will be fully informed by an adversarial process as to all issues in the case.

## III.    ALTERNATIVELY, PERMISSIVE INTERVENTION IS APPROPRIATE.

Because Movant States satisfy the standard for intervention as-of-right, this Court need not consider permissive intervention under Rule 24(b). But to the extent this Court reaches that issue, permissive intervention is also warranted. Permissive intervention is appropriate where, on timely motion, the proposed intervenor shows it "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). "In exercising its discretion, the [district court] must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). Courts have broad discretion in determining whether to grant permissive intervention. *Territory of the V.I.*, 748 F.3d at 524.

That standard is easily met here. Common questions of law and fact exist because Movant States and Federal Defendants both oppose Plaintiffs' requested relief seeking to enjoin enforcement of the same federal statute on Second Amendment grounds—Movant States simply offer an additional merits-based defense of the same federal statute that the Federal Defendants have for the first time declined to provide. Moreover, this motion is timely, and intervention would neither unduly delay nor prejudice the adjudication of the existing parties' rights. *See supra* at Part I.C. This Court has issued no merits decision here, and Movant States requested intervention (and filed a brief seeking summary judgment) prior to the Plaintiffs' filing of a reply brief, allowing them to press their own responses on the merits. By allowing Movant States to participate as intervenors, this Court will benefit from adversarial briefing on the merits of the Second Amendment issue, should the Court choose to reach those merits, and Movant States will have the opportunity to defend their profound interests in the duly regulated state and federal framework for handgun

mailing—where invalidation would undermine their own laws on prohibited weapons and prohibited persons alike and undermine their enormous law enforcement interests.

## **CONCLUSION**

This Court should grant Movant States' motion to intervene as defendants.

Dated: March 2, 2026                                   Respectfully submitted,

**KATHLEEN JENNINGS**                        **JENNIFER DAVENPORT**
Attorney General of Delaware                   Attorney General of New Jersey

By: */s/ Ian R. Liston*                              By: */s/ Meghan K. Musso*
Ian R. Liston*                                      Meghan K. Musso*
Jennifer Kate Aaronson*                         Deputy Attorney General
Deputy Attorneys General                        124 Halsey Street, 5th Floor
Delaware Department of Justice               Newark, New Jersey 07101
820 N. French Street                              (609) 696-5276
Wilmington, DE 19801                           Meghan.musso@law.njoag.gov
(302) 683-8875                                     *Counsel for the State of New Jersey*
ian.liston@delaware.gov
jennifer.aaronson@delaware.gov
*Counsel for the State of Delaware*

**LETITIA JAMES**
Attorney General of the State of New York

By: */s/ James Thompson*
James M. Thompson*
Special Counsel for Second
Amendment Litigation
Molly Thomas-Jensen*
Special Counsel
Danny Yao Li**
Assistant Solicitor General
28 Liberty St.
New York, New York 10005
(212) 416-8679
james.thompson@ag.ny.gov
molly.thomas-jensen@ag.ny.gov
danny.li@ag.ny.gov
*Counsel for the State of New York*

* Admitted *pro hac vice*
** *Pro hac vice* application forthcoming