UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA
------------------------------------------------------------------------X

BONITA SHREVE, GUN OWNERS OF AMERICA,
INC., and GUN OWNERS FOUNDATION,

                *Plaintiffs*,

      -against-                      No. 3:25-cv-00214-SLH

UNITED STATES POSTAL SERVICE; DOUG              **ORAL ARGUMENT**
TULINO, in his official capacity as U.S. Postmaster    **REQUESTED**
General; UNITED STATES POSTAL INSPECTION
SERVICE; GARY BARKSDALE, in his official
capacity as Chief Postal Inspector; and UNITED
STATES DEPARTMENT OF JUSTICE,

                *Defendants,*

STATE OF DELAWARE, STATE OF NEW YORK,
and STATE OF NEW JERSEY,

                *Intervenors*.
------------------------------------------------------------------------X

### PROPOSED BRIEF OF STATE INTERVENORS IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT

| KATHY JENNINGS | JENNIFER DAVENPORT | LETITIA JAMES |
|---|---|---|
| Attorney General | Attorney General | Attorney General |
| State of Delaware | State of New Jersey | State of New York |
| Carvel State Building | 25 Market Street | 28 Liberty Street |
| 820 North French Street | Trenton, NJ 08625 | New York, NY 10005 |
| Wilmington, DE 19801 | | |
| | Meghan Musso | James M. Thompson |
| Ian Liston | Deputy Attorney General | Molly Thomas-Jensen |
| Jennifer Kate Aaronson | Of Counsel | Special Counsel |
| Deputy Attorneys General | | Danny Yao Li |
| Of Counsel | | Assistant Solicitor General |
| | | Of Counsel |

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 2

LEGAL STANDARD .......................................................................................................... 4

ARGUMENT ..................................................................................................................... 4

   I.     SUPREME COURT PRECEDENT FORECLOSES PLAINTIFFS' FACIAL
        CONSTITUTIONAL CHALLENGE .................................................................. 4

   II.    SECTION 1715 DOES NOT IMPLICATE THE TEXT OF THE SECOND
        AMENDMENT .................................................................................................. 6

   III.  SECTION 1715 IS CONSISTENT WITH THE NATION'S HISTORY OF
        FIREARMS REGULATION ............................................................................... 9

     A. The Federal Government Has a Long History of Prohibiting the Mailing of Firearms..... 9

     B. Section 1715 is Supported by Numerous Traditions of Firearms Regulation.................. 14

        1. Section 1715 is integral to the proper functioning of background check and
           licensing laws. ................................................................................................... 15

        2. Section 1715 is analogous to Founding-era restrictions on the shipment and
           distribution of dangerous weapons. ............................................................... 18

   IV.  SECTION 1715 IS A LAWFUL EXERCISE OF CONGRESS'S POSTAL POWERS.. 20

   V.   THE GOVERNMENT AS A BUSINESS PROPRIETOR CAN REFUSE TO SHIP
        HANDGUNS ....................................................................................................... 21

CONCLUSION.................................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Antonyuk v. James*,
  120 F.4th 941 (2d Cir. 2024) ...............................................................................13

*Bondi v. VanDerStok*,
  604 U.S. 458 (2024).................................................................................................5

*Bonidy v. U.S. Postal Serv.*,
  790 F.3d 1121 (10th Cir. 2015) ...................................................................... 22-23

*Currier v. Potter*,
  379 F.3d 716 (9th Cir. 2004) ...............................................................................21

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)............................................................................................6, 8

*Drummond v. Robinson Twp.*,
  9 F.4th 217 (3d Cir. 2021) ......................................................................................7

*Ex parte Jackson*,
  96 U.S. 727 (1877)......................................................................................... 20-21

*Gazzola v. Hochul*,
  88 F.4th 186 (2d Cir. 2023) ....................................................................................7

*Giambalvo v. Suffolk County*,
  155 F.4th 163 (2d Cir. 2025) ................................................................................16

*Gordon v. Holder*,
  826 F. Supp. 2d 279 (D.D.C. 2011)......................................................................20

*Kipke v. Moore*,
  165 F.4th 194 (4th Cir. 2026) ........................................................................ 22-23

*Maryland Shall Issue, Inc. v. Moore*,
  116 F.4th 211 (4th Cir. 2024) (en banc) ................................................................8

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010)................................................................................................8

*McRorey v. Garland*,
  99 F.4th 831 (5th Cir. 2024) ............................................................................. 7-8

*Musser's Inc. v. United States*,
  1 F. Supp. 3d 308 (E.D. Pa. 2014) ...................................................................................20

*New York State Firearms Ass'n v. James*,
  157 F.4th 232 (2d Cir. 2025) .............................................................................................8

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  597 U.S. 1 (2022)......................................................................... 6, 8-9, 14, 16, 19

*Pakas v. United States*,
  240 F. 350 (2d Cir. 1917)...................................................................................................20

*Pitsilides v. Barr*,
  128 F.4th 203 (3d Cir. 2025) ............................................................................................15

*Pittsburgh Lg. of Young Voters Educ. Fund v. Port Auth. of Allegheney Cty.*,
  No. 06 Civ. 1064, 2008 WL 4965855 (W.D. Pa. Aug. 14, 2008) ..........................................23

*Range v. Attorney General United States*,
  124 F.4th 218 (3d Cir. 2024) ........................................................................................6, 16

*Rigby v. Jennings*,
  630 F. Supp. 3d 602 (D. Del. 2022)....................................................................................8

*Stanford v. Lunde Arms Corp.*,
  211 F.2d 464 (9th Cir. 1954) .........................................................................................3, 8

*Straus v. United States Postal Service*,
  296 F. Supp. 3d 705 (E.D. Pa. 2017) ................................................................................13

*Teixeira v. County of Alameda*,
  873 F.3d 670 (9th Cir. 2017) ...........................................................................................18

*Tundo v. County of Passaic*,
  923 F.3d 283 (3d Cir. 2019)...............................................................................................4

*United States v. Barry*,
  888 F.2d 1092 (6th Cir. 1989) ..........................................................................................20

*United States v. Barnes*,
  Crim. No. 23-12, 2024 WL 33228593, at *4-5 (D. Del. 2024) .............................................18

*United States v. Coates*,
  No. 1:23-CR-0192, 2025 WL 2178416 (M.D. Pa. July 31, 2025)............................................17

iii

*United States v. Cruikshank*,
  92 U.S. 542 (1875)..................................................................................................13

*United States v. Cuevas-Almonte*,
  156 F.4th 319 (3d Cir. 2025) ............................................................................. 4-5

*United States v. Gray*,
  No. 3:24-cv-00116 (M.D. Tenn.)............................................................................5

*United States v. James*,
  677 F. Supp. 3d 329 (D.V.I. 2023) .........................................................................8

*United States v. Kokinda*,
  497 U.S. 720 (1990)...............................................................................................22

*United States v. Manney*,
  114 F.4th 1048 (9th Cir. 2024) ...............................................................................7

*United States v. Marcavage*,
  609 F.3d 265 (3d Cir. 2010)....................................................................................5

*United States v. Newsome*,
  No. 1:24-cr-00337-AMN (N.D.N.Y.)......................................................................5

*United States v. Perez*,
  No. 3:23-cr-92 (D. Conn.)........................................................................................5

*United States v. Peterson*,
  161 F.4th 331 (5th Cir. 2025) ...............................................................................16

*United States v. Powell*,
  423 U.S. 87 (1975)........................................................................3, 8, 15, 17, 20, 23

*United States v. Rahimi*,
  602 U.S. 680 (2024)............................................................... 1, 4, 9, 14-15, 19

*United States v. Vereen*,
  152 F.4th 89 (2d Cir. 2025) ...............................................................................7, 18

*United States v. Waller*,
  No. 2:24-cr-90, 2025 WL 3114206 (W.D. Pa. Nov. 7, 2025) ................................16

*United States v. Waulk*,
  No. 3:20-cr-31, 2024 WL 3937489 (W.D. Pa. Aug. 26, 2024) ........................16, 19

*Vidal v. Elster,*
    602 U.S. 286 (2024)......................................................................... 4, 9, 12, 14-15, 19

*Washington State Grange v. Washington State Republican Party,*
    552 U.S. 442 (2008)........................................................................................................4

*Youngs Rubber Corp. v. C. I. Lee & Co.,*
    45 F.2d 103 (2d Cir. 1930)...........................................................................................21

**Constitutions**

U.S. Const. art. I, § 8........................................................................................................20

U.S. Const. amend. I ............................................................................................... 20-21, 23

U.S. Const. amend. II....................................................... 1, 3-4, 6-9, 12-15, 18-19, 20-23

U.S. Const. amend. IV ......................................................................................................21

**Federal Statutes**

18 U.S.C.
    § 922.........................................................................................................................2
    § 922(g)...................................................................................................................15
    § 923(g)(1) .............................................................................................................17
    § 922(t)....................................................................................................................16
    § 1715.................................................................................................1-9, 14-15, 18-23

*An Act Making Appropriations for the Service of the Post Office Department for the*
    *Fiscal Year Ending June Thirtieth, Eighteen Hundred and Eighty, and for Other*
    *Purposes*, ch. 180, § 7, 20 Stat. 355, 358 (1879) .......................................................11

*An Act Prohibiting for a limited time the Exportation of Arms and Ammunition, and*
    *encouraging the Importation of the same*, 3 Cong. ch. 33, 1 Stat. 369 (May 22, 1794) .........19

*An Act to Amend the Laws Relating to the Post-Office Department*
    ch. 71, §§ 19-20, 12 Stat. 701 (1863)........................................................................10

*An Act to establish the Post-Office and Post Roads within the United* States, 2 Cong. Ch.
    7, 1 Stat. 232 § 2 (Feb. 20, 1792)................................................................................9

*An Act to Revise, Consolidate, and Amend the Statutes Relating to the Post-Office*
    *Departments*, ch. 335, 17 Stat. 283 (1872) ...............................................................11

*Postal Laws and Regulations of the United States of America* § 370(10), at 155 (1887) .............12

**State Statutes**

11 Del. C.
§ 1448D(h) ..................................................................................................................16

24 Del. C.
§ 904 .........................................................................................................................17

18 Pa.C.S.
§ 6105 ........................................................................................................................15
§ 6111 ........................................................................................................................16

Del. Code
§ 1448 ........................................................................................................................15
§ 1448D(f) ..................................................................................................................15

N.J. Stat. Ann.
§§ 2C:25-17 to -35 .....................................................................................................15
§ 2C:58-2(b) ...............................................................................................................17
§ 2C:58-3(a)(3), (b) ....................................................................................................16
§ 2C:58-3(c) ...............................................................................................................15
§§ 2C:58-20 to -32 .....................................................................................................15
§ 2C:391(w) ................................................................................................................17

N.Y. Gen. Bus. Law
§ 875-f ........................................................................................................................17
§ 898 ..........................................................................................................................16

N.Y. Penal Law
§ 265.00(22)(c) ...........................................................................................................17
§ 265.17 .....................................................................................................................15

**Rules**

Fed. R. Civ. P. 56(a) ..........................................................................................................4

**Miscellaneous Authorities**

66 Cong. Rec. 726 (1924) .................................................................................................3

66 Cong. Rec. 727 (1924) (statement of Rep. John F. Miller) .........................................12

66 Cong. Rec. 728 (1924) (statement of Rep. Morton Hull) ...........................................13

66 Cong. Rec. 728 (1924) (statement of Rep. C. William Ramseyer) .............................13

66 Cong. Rec. 736 (1924) (statement of Rep. Thomas Blanton)....................................................13

68 Cong. Rec. 2805 (1927)...............................................................................................................12

I Richard R. John, *The American Postal Network 1792-1914* (Pickering & Chatto 2012)............9

VI John Broadhead, *Documents Relative to the Colonial History of the State of New-York* 254-55 (1855)......................................................................................................................19

*Annual Report of the Postmaster-General of the United States for the Fiscal Year Ended June 30, 1904* (1904) ......................................................................................................12

*Annual Report of the Postmaster General for the Fiscal Year Ended June 30, 1925* (1925)......................................................................................................................................12

Arthur W. Austin, *A Memorandum Concerning the Charlestown Post-Office* (Jan. 27, 1834) ...................................................................................................................................10

Bureau of Alcohol, Tobacco, Firearms, and Explosives, *National Firearms Commerce and Trafficking Assessment: Crime Guns – Volume Two*.........................................................17

H.R. Rep. No. 610, 69th Cong., 1st Sess. (1926) ...........................................................................3

2 John Bach McMaster, *A History of the People of the United States, from the Revolution to the Civil War* 617 (1919) ....................................................................................................9

Letter from Robert Johnson, Second Assistant Postmaster General (March 1838) .......................10

Rick Sapp, *Standard Catalog of Colt Firearms* 43 (Gun Digest Books 2007) .............................11

Timothy Pickering, *Instructions to the Deputy Postmasters* (1792)...............................................9

**<u>PRELIMINARY STATEMENT</u>**

For nearly a century, 18 U.S.C. § 1715 has restricted the availability of the U.S. Postal Service to mail certain concealable firearms to licensed entities while imposing no prohibition on private carriers, to ensure the Postal Service is not used to enable criminal actors to evade state firearm safety laws. The intervening States of Delaware, New Jersey, and New York agree with the federal defendants that plaintiffs' challenge to Section 1715 fails on justiciability grounds. If this Court nevertheless reaches the constitutional merits, it should grant summary judgment to defendants because Section 1715 comports with the Second Amendment.

*First*, plaintiffs fail to satisfy their heavy burden to show that Section 1715 violates the Second Amendment in all its applications, as is necessary to bring a facial constitutional challenge. As the U.S. Supreme Court made clear in *United States v. Rahimi*, a facial challenge under the Second Amendment is categorically unavailable if the challenged statute has at least some constitutional applications. *See* 602 U.S. 680, 693 (2024). There are numerous constitutional applications of Section 1715, such as in prosecutions against persons engaged in unlawful interstate firearms trafficking or in the mailing of concealable firearms that lack constitutional protection. Plaintiffs' facial challenge may therefore be denied on this ground alone.

*Second*, Section 1715 does not implicate the text of the Second Amendment because it does not restrict a person from "keep[ing] or bear[ing] arms" but instead imposes conditions on a particular method of transferring firearms. While the statute generally restricts mailing firearms through the Postal Service, it does not restrict mailing through private carriers such as UPS or FedEx and expressly permits the mailing of firearms by federally licensed firearm manufacturers and dealers. Such modest restrictions on the use of the mails do not implicate the Second Amendment.

*Third*, and in any event, Section 1715 is consistent with the Nation's tradition of firearm regulation. For most of the Nation's history, firearms were not accepted for mailing by the Postal Service. In 1927, after a brief period of legalization, Congress enacted Section 1715 to respond to the use of federal mails to evade state and local firearms trafficking laws and to protect postal workers and the public. Accordingly, there is simply no tradition of using the mails to transfer firearms. Moreover, Section 1715 is amply supported by several affirmative traditions of firearm regulation, including well-established background check requirements for gun purchases, prohibitions on possession of weapons by dangerous persons, and regulation of the distribution of firearms to prevent them from being delivered to dangerous persons.

*Fourth*, Section 1715 is a reasonable exercise of Congress's broad powers over the postal system. *Fifth*, and finally, Section 1715 is a permissible restriction on the Postal Service's proprietary commercial services.

## STATEMENT OF FACTS

Congress enacted Section 1715 in 1927 to restrict the mailing of concealable firearms through the Postal Service. The statute provides that, as a general matter, "[p]istols, revolvers, and other firearms capable of being concealed on the person are nonmailable and shall not be deposited in or carried by the mails or delivered by any officer or employee of the Postal Service." 18 U.S.C. § 1715. The statute does not prohibit the shipment of concealable firearms by private companies, such as FedEx or UPS, and expressly permits the shipment of firearms through the Postal Service by federally licensed firearms manufacturers and dealers. *See id*. Federal statutes separately regulate firearm shipments by federal firearms licensees and common or contract carriers to ensure such firearms cannot be mailed to prohibited persons. *See* 18 U.S.C. § 922.

2

The purpose of Section 1715 is to "avoid having the Post Office serve as an instrumentality for the violation of local laws which prohibited the purchase and possession of weapons" and "to make it more difficult for criminals to obtain concealable weapons." *United States v. Powell*, 423 U.S. 87, 91 (1975) (citing H.R. Rep. No. 610, 69th Cong., 1st Sess. (1926) and 66 Cong. Rec. 726 (1924)); *see also Stanford v. Lunde Arms Corp.*, 211 F.2d 464, 466 (9th Cir. 1954) (observing that the purpose of Section 1715 is to prevent criminals from circumventing "State laws" and "municipal regulations governing the sale of firearms within [] city limits" (quoting 66 Cong. Rec. 726 (1924))).

In July 2025 plaintiffs filed this lawsuit, asserting that Section 1715 violates the Second Amendment on its face and seeking declaratory and permanent injunctive relief as against several federal agencies and officials. *See* ECF No. 1. As alleged in the complaint and in plaintiffs' moving papers, plaintiff Bonita Shreve wishes to transfer an old pistol to her father, who lives approximately three hours away. Compl. ¶¶ 14-15; ECF No. 25-1 ("Shreve Decl.") ¶¶ 2, 4-6. Shreve alleges that she has "no plans to visit [her] parents" and would rather send the pistol by mail, which she estimates would cost "about $20." Shreve Decl. ¶¶ 6-7. Shreve acknowledges that a local firearms dealer is available to legally ship the gun to a dealer near her father, but she estimates the cost of doing so would be between $60 and $100. *Id.* ¶ 9. The two organizational plaintiffs (Gun Owners of America, Inc. and Gun Owners Foundation) identify no specific member other than Shreve who is purportedly injured by the restrictions in Section 1715.

In December 2025, plaintiffs moved for summary judgment. ECF No. 23. One month later, the federal defendants opposed and cross-moved for summary judgment, arguing that the suit should be dismissed on various justiciability grounds. ECF No. 27. The federal defendants declined to defend the constitutionality of Section 1715, citing to a memorandum opinion issued

3

by the Office of Legal Counsel (OLC) the day prior to defendants' filing, in which OLC purported to find that Section 1715 violates the Second Amendment in certain applications. *See* ECF Nos. 27 and 27-1. Shortly thereafter, the States of Delaware, New Jersey, and New York notified the court and the parties of their intent to move to intervene as defendants for the limited purpose of providing arguments in support of the constitutionality of Section 1715. ECF No. 31.

## LEGAL STANDARD

Summary judgment is proper if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view all facts and draw all reasonable inferences in favor of the nonmovant. *Tundo v. County of Passaic*, 923 F.3d 283, 287 (3d Cir. 2019).

## ARGUMENT

**I.    SUPREME COURT PRECEDENT FORECLOSES PLAINTIFFS' FACIAL CONSTITUTIONAL CHALLENGE**

As the Supreme Court explained in *Rahimi,* a claim that a statute is unconstitutional on its face "is the 'most difficult challenge to mount successfully,' because it requires [a challenger] to 'establish that no set of circumstances exists under which the [law] would be valid.'" 602 U.S. at 693 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Facial pre-enforcement challenges such as this one are particularly "disfavored because they rest on undeveloped factual records or require speculation on hypothetical applications." *United States v. Cuevas-Almonte*, 156 F.4th 319, 328 (3d Cir. 2025). Moreover, facial challenges "run contrary to the fundamental principle of judicial restraint that courts should . . . [not] 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008) (quoting *Ashwander v. TVA*, 297

4

U.S. 288, 346-47 (1936) (Brandeis, J., concurring)) (internal quotation marks omitted); *see also Bondi v. VanDerStok*, 604 U.S. 458, 473 (2024).

In determining whether a challenge is facial or as-applied, courts consider "the scope of the statute's claimed constitutional infirmity and the breadth of the remedy sought." *Cuevas-Almonte*, 156 F.4th at 329 (3d Cir. 2025). Here, plaintiffs' challenge to Section 1715 is plainly facial because plaintiffs contend that the statute is "unconstitutional as written." *United States v. Marcavage*, 609 F.3d 265, 273 (3d Cir. 2010). In addition, plaintiffs request facial relief in so far as they seek to enjoin the federal defendants from enforcing Section 1715 as against any person. *See* ECF No. 1 at 25; ECF No. 24 at 1 ("Section 1715 should be declared unconstitutional, and its continued enforcement enjoined."). Finally, neither the complaint nor plaintiffs' summary judgment motion seeks as-applied relief in the alternative.

This facial challenge to Section 1715 fails because plaintiffs cannot show that the statute is unconstitutional in every application. Indeed, even the OLC memorandum concludes that Section 1715 is purportedly unconstitutional only in certain applications. ECF No. 27-1 at 11-12 (opining that Section 1715 could be enforced against "firearms that lack constitutional protection" such as "undetectable firearms" or "concealable gadget-type guns"). And one can readily conceive of numerous other constitutional applications of Section 1715, such as, for example, to prosecute a person who sought to sell handguns across state lines in violation of federal and state law, *see, e.g., United States v. Newsome* (N.D.N.Y.) (Case No. 1:24-cr-00337-AMN), or to prosecute a person who shipped handguns to someone they knew was illegally trafficking in firearms, *see, e.g., United States v. Gray* (M.D. Tenn.) (Case No. 3:24-cv-00116); *United States v. Perez* (D. Conn.) (Case No. 3:23-cr-92). Plaintiffs dispute none of this, focusing instead on the constitutional protections purportedly afforded to their "proposed course of conduct." ECF No. 23-1 at 22.

Accordingly, this Court may grant summary judgment in favor of defendants on the ground that plaintiffs have failed to meet the high burden to prevail on a facial constitutional challenge.

## II. SECTION 1715 DOES NOT IMPLICATE THE TEXT OF THE SECOND AMENDMENT

When resolving a Second Amendment challenge, courts "must first decide whether the text of the Second Amendment applies to a person and his proposed conduct." *Range v. Attorney General United States*, 124 F.4th 218, 225 (3d Cir. 2024). If a regulation does not implicate the Second Amendment's text, it may be upheld on that ground alone. *See id.*

The Second Amendment provides that "the right of the people to keep and bear Arms[] shall not be infringed." U.S. Const. amend. II. This clause "guarantees the individual right to possess and carry weapons in case of confrontation." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 20 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008)) (alteration omitted). Section 1715 does not implicate the plain text of the Second Amendment for two reasons.

*First*, mailing arms does not constitute "keeping" or "bearing" arms. As the Supreme Court has explained, the phrase to "'[k]eep arms' was simply a common way of referring to possessing arms," noting that Dr. Samuel Johnson "defined 'keep' as, most relevantly, '[t]o retain; not to lose,' and '[t]o have in custody,'" while Noah Webster defined it as "[t]o hold; to retain in one's power or possession." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008). Likewise, the Court has explained that the "natural meaning" of the phrase to "bear" arms is to "wear, bear, or carry upon the person or clothing or in a pocket, for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id.* at 584 (alterations omitted). The act of mailing arms is simply not encompassed by the plain meaning of these terms.

6

To be sure, some courts have reasoned that the Second Amendment extends beyond possessing and carrying firearms. *See, e.g.*, *United States v. Vereen*, 152 F.4th 89, 95 (2d Cir. 2025) ("The right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair."); *but see, e.g., Drummond v. Robinson Twp.*, 9 F.4th 217, 230 (3d Cir. 2021) (noting that "no court, modern or otherwise, [holds] that the Second Amendment secures a standalone right to *sell* guns"). But even then, "as [multiple] Circuits have recognized, such 'ancillary rights' are only protected to the extent that they are 'necessary to the realization' of the textually specified right to keep and bear arms." *Vereen*, 152 F.4th at 95 (collecting cases); *see also McRorey v. Garland*, 99 F.4th 831, 836-37 (5th Cir. 2024). Thus, federal appellate courts have held that a law regulating modes of acquiring firearms "implicates the text of the Second Amendment only if it makes acquiring firearms sufficiently more difficult so as to meaningfully constrain individuals from keeping or bearing them." *Vereen*, 152 F.4th at 97; *see also Gazzola v. Hochul*, 88 F.4th 186, 196-97 (2d Cir. 2023) (collecting circuit precedents); *United States v. Manney*, 114 F.4th 1048, 1052 (9th Cir. 2024).

Section 1715 does not "have the effect of eliminating the ability of law-abiding, responsible citizens to acquire firearms." *Gazzola*, 88 F.4th at 196. As discussed above (at 2), Section 1715 does not ban the sale of firearms in any way, nor does it even ban the transfer of concealable firearms through the Postal Service. To the contrary, as plaintiffs acknowledge (ECF No. 1-2 ¶ 9), Section 1715 permits the mailing of concealable firearms through private carriers, or through the Postal Service by federally licensed manufacturers and dealers. Plaintiff Shreve, for instance, admits that she can ship her gun to a dealer near her father for a fee between $60 and $100, as compared to $20 to ship the gun by mail. *Id.* As courts in this Circuit have repeatedly held,

7

comparably modest restrictions on the transfer of firearms "may make purchasing a firearm more inconvenient" but do not "amount to a Second Amendment burden." *Rigby v. Jennings*, 630 F. Supp. 3d 602, 613 (D. Del. 2022); *see also United States v. James*, 677 F. Supp. 3d 329, 344-45 (D.V.I. 2023) (holding that a law forbidding unlicensed individuals from transferring firearms to unlicensed individuals across state lines does not fall within the Second Amendment's plain text).

*Second*, Section 1715 is a presumptively lawful "condition[] and qualification[] on the commercial sale of arms" that does not implicate the text of the Second Amendment. *Heller*, 554 U.S. at 626-27 & n.26; *see McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010); *Bruen,* 597 U.S. at 81 (Kavanaugh, J., concurring). As the Supreme Court has observed, Congress enacted Section 1715 to "avoid having the Post Office serve as an instrumentality for the violation of local laws" regulating the sale of firearms. *Powell*, 423 U.S. at 91. Similarly, the Ninth Circuit has explained that the purpose of Section 1715 is to prevent criminals from circumventing state and local "regulations governing the sale of firearms within [] city limits." *Stanford*, 211 F.2d at 466. Section 1715 is thus a critical component of the longstanding partnership between state and federal governments to enforce commercial firearm regulations. The law "complements local commercial regulations, preventing individuals from sidestepping the lawful conditions and qualifications limiting the transfers of firearms," *James*, 677 F. Supp. 3d at 345, while protecting postal workers and the public. In that sense, Section 1715 is analogous to the type of requirements routinely upheld as lawful commercial regulations on the sale of arms. *See, e.g.*, *New York State Firearms Ass'n v. James*, 157 F.4th 232 (2d Cir. 2025) (background checks on ammunition sales); *McRorey v. Garland*, 99 F.4th 831 (5th Cir. 2024) (background checks and waiting periods); *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211 (4th Cir. 2024) (en banc) (background check and licensing requirement for handgun purchases).

8

### III.    SECTION 1715 IS CONSISTENT WITH THE NATION'S HISTORY OF FIREARMS REGULATION

Plaintiffs' challenge to Section 1715 would fail even if the statute implicated the text of the Second Amendment because the law "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. First, there is no evidence to support a purported tradition of mailing firearms through the Postal Service. To the contrary, such conduct has been implicitly or explicitly prohibited for nearly the entirety of the Nation's history. Second, and in any event, "a 'historical twin' is not required," *Rahimi*, 602 U.S. at 701 (quoting *Bruen*, 597 U.S. at 30), and Section 1715 is independently supported by several well-established traditions of firearms regulation aimed at preventing the misuse of firearms by dangerous persons.

### A.    The Federal Government Has a Long History of Prohibiting the Mailing of Firearms.

The U.S. Postal Service was established in 1792 and charged with delivering "letters, newspapers and packets." An Act to establish the Post-Office and Post Roads within the United States, 2 Cong. Ch. 7, 1 Stat. 232 § 2 (Feb. 20, 1792), Declaration of James M. Thompson (the "TD") Ex. 1; *see also* Timothy Pickering, *Instructions to the Deputy Postmasters* (1792), reprinted in I Richard R. John, *The American Postal Network 1792-1914* 3-5 (Pickering & Chatto 2012), TD Ex. 12. The mailing of weapons was not contemplated by the Founders, nor would it have been practicable given the high costs of mailing. Sending a letter from Johnstown to Philadelphia would have cost seventeen cents in the late eighteenth-century; by contrast, sending a ten-pound Revolutionary-era musket would have cost $108.80. *See* TD Ex. 1 § 9. Such an amount would have been ruinously expensive at a time when "the average rate of wages the land over was . . . sixty-five dollars a year, with food, and, perhaps, lodging." 2 John Bach McMaster, *A History of the People of the United States, from the Revolution to the Civil War* 617 (1919).

An 1838 directive from the Postmaster General to his employees similarly stipulated that the service would be used for "three classes of postage," namely "letters," "newspapers," or "pamphlets." Letter from Robert Johnson, Second Assistant Postmaster General (March 1838), TD Ex. 2; *see also* Arthur W. Austin, *A Memorandum Concerning the Charlestown Post-Office* (Jan. 27, 1834), reprinted in John, *supra* at 92, TD Ex. 13 (discussing the contents of the mail as "letters, newspapers and pamphlets"). While the Postmaster General contemplated that something might be put in the mail "which is not either a newspaper, a pamphlet, or a magazine," all of the exemplars that he identified were paper communications: "handbills, printed or written; prices current, sealed or unsealed; proposals for new publications; circulars, lottery bills and advertisements, blank forms, deeds, law processes, policies of insurance, and manuscript copy for publication." *Id*. Moreover, the Postmaster General instructed employees to "exclude from the mail packets of every description weighing more than three pounds, and all articles that would hazard the security of the mails, or expose them to be worn or defaced," *id.*, a requirement that in effect precluded the shipment of firearms.

Congress reorganized the post office in 1863 and specified a limited list of what constituted "mailable matter," divided into three classes. *An Act to Amend the Laws Relating to the Post-Office Department*, ch. 71, §§ 19-20, 12 Stat. 701 (1863), TD Ex. 3. First class mail included "all correspondence, wholly or partially in writing," with some exceptions designated third class. *Id.* § 20. Second class mail included "all mailable matter exclusively in print, and regularly issued at stated periods," in other words, periodicals like newspapers and magazines. *Id.* And "[t]he third class embraces all other matter which is or may hereafter be by law declared mailable; embracing all pamphlets, occasional publications, books, book manuscripts, and proof sheets, whether corrected or not, maps, prints, engravings, blanks, flexible patterns, samples and sample cards,

10

phonographic paper, letter envelopes, postal envelopes, or wrappers, cards, paper, plain or ornamental, photographic representations of different types, seeds, cuttings, bulbs, roots, and scions." *Id.* Guns were not included in Congress' list of mailable matter.

The 1872 Post Office Act similarly contained statutory provisions that had the effect of excluding firearms. *An Act to Revise, Consolidate, and Amend the Statutes Relating to the Post-Office Departments*, ch. 335, 17 Stat. 283 (1872), TD Ex. 4. The act expanded the scope of third class mail to include new examples (such as "posters" and "samples of metals") as well as a provision allowing the Postal Service to accept "all other matter which may be declared mailable by law, and all other articles not above the weight proscribed by law." *Id.* § 133. But that weight limit would have excluded virtually all firearms, since by statute "[a]ll matter of the third class, excepting books and other printed matter . . . shall not exceed twelve ounces in weight."[1] *Id.*

In 1879, Congress enacted the Classification Act of 1879, which created a fourth class of mail consisting of "merchandise." *An Act Making Appropriations for the Service of the Post Office Department for the Fiscal Year Ending June Thirtieth, Eighteen Hundred and Eighty, and for Other Purposes*, ch. 180, § 7, 20 Stat. 355, 358 (1879), TD Ex. 5. The new class encompassed "all matter not embraced in the first, second, or third class, which is not in its form or nature liable to destroy, deface, or otherwise damage the contents of the mail bag, or harm the person of any one engaged in the postal service," subject to a four-pound limit. *Id.* § 20. There is no indication in the considerable legislative history of the Classification Act that Congress intended to make firearms mailable; however, the 1887 edition of the Postal Regulations for the first time stated that "[p]istols

---

[1] Few if any weapons at the time would have weighed less than the Postal Service's twelve-ounce limit. Perhaps the most popular revolver of the time, the Colt Model 1851 Navy, weighed two pounds, ten ounces. *See* Rick Sapp, *Standard Catalog of Colt Firearms* 43 (Gun Digest Books 2007). Even the Colt Model 1849 "Pocket" revolver "weighed a mere 1 lb., 11 oz." in its typical configuration. *Id.* at 41.

11

or revolvers, in detached parts, may be sent in the mails," subject to examination by the mailing postmaster. *Postal Laws and Regulations of the United States of America* § 370(10), at 155 (1887), TD Ex. 6.

The change in policy led to substantial concerns. For example, the Postmaster General complained to Congress in 1904 that "loaded revolvers and other explosives are continually intercepted in the mails and consigned to the Dead-Letter Office Museum. Some adequate punishment should be provided for those who thus recklessly endanger the lives of mail clerks." *Annual Report of the Postmaster-General of the United States for the Fiscal Year Ended June 30, 1904*, at 7 (1904), TD Ex. 7. And in 1925 the Postmaster General warned in his annual message to Congress that "[i]n many jurisdictions [the mailability of guns] operates to defeat local laws and regulations prohibiting the purchase and possession of such articles. Many complaints have been received in this connection and it is believed that the department should not be compelled to carry firearms under these conditions." *Annual Report of the Postmaster General for the Fiscal Year Ended June 30, 1925,* at 65 (1925), TD Ex. 8.

In response, Congress drafted legislation to prevent "the enormous traffic in firearms of this [concealable] character sent into communities where the addresses are undoubtedly barred from making local purchases." 66 Cong. Rec. 727 (1924) (statement of Rep. John F. Miller (R-Wash.)). The measure was endorsed "by the police authorities of substantially every large city in America." *Id.* The bill passed the House overwhelmingly. *See id.* at 737. It was subsequently enacted in 1927. *See* 68 Cong. Rec. 2805.

The Congresses that considered and ultimately passed the prohibition on mailing firearms in the Postal Service expressly determined it to be constitutional under the Second Amendment. *Cf. Vidal v. Elster*, 602 U.S. 286, 304 (2024) (including laws passed in 1911 and 1946 in

12

considering the First Amendment's historic tradition as applied to trademark law). While Congressman Thomas Blanton raised constitutional objections to the proposed legislation, suggesting that the Postmaster General was "trying to take away from the law-abiding people the constitutional right to keep firearms in their homes," 66 Cong. Rec. 736 (1924) (statement of Rep. Thomas Blanton), the bill's proponents emphasized its constitutionality, with Congressman Morton Hull emphasizing that "[t]here is not a single line or word in the proposed act that prevents a man having a firearm in his home under any constitutional guaranty that he has." 66 Cong. Rec. 728 (1924) (statement of Rep. Morton Hull). The bill's leading proponent, Congressman C. William Ramseyer similarly emphasized that "this bill does not undertake to regulate the States. The only thing it undertakes to do is to tell the person who wants a pistol that he can not use an agency of the Federal Government to transport the pistol." 66 Cong. Rec. 728 (1924) (statement of Rep. C. William Ramseyer).

These views were bolstered by the complete absence of legal challenges to pre-1879 statutes and regulations that implicitly barred the mailing of firearms by the Postal Service. "The United States Postal Service is unquestionably a federal program," to which federal law and the federal Constitution apply directly. *Straus v. United States Postal Service*, 296 F. Supp. 3d 705, 708 n.3 (E.D. Pa. 2017) (citing U.S. Const. art I, § 8, cl. 7). The Postal Service had accordingly been subject to suit for Second Amendment violations since the Nation's founding. *See United States v. Cruikshank*, 92 U.S. 542, 553 (1875) (Second Amendment's effect is "to restrict the powers of the national government"). The fact that neither the founding generation nor any of the generations after brought such suits despite this prohibition being in effect nearly continuously is a strong indication that they did not view the Second Amendment as requiring the shipping of guns by mail. *See Antonyuk v. James*, 120 F.4th 941, 990 (2d Cir. 2024) (finding history probative where

13

"the record not only lacks any successful challenges" to historical measures, "but also lacks any challenges at all.").

To be sure, the sending of certain light firearms by mail was understood to be legal from 1879 through 1926, but that sheds little light on the original public meaning of the Constitution. *See Bruen*, 597 U.S. at 66, 69 (concluding that certain laws deserve "little weight" given "their temporal distance from the founding" and the fact that they were "short lived"). That is particularly the case here, because Congress' action in legalizing the mailing of firearms weighing under four pounds in 1879 contained no indication that it did so based on any belief that the Constitution required it. Indeed, the States' review of the voluminous legislative history of the 1879 act revealed no reference to firearms at all. Conversely, the Congresses that debated and enacted Section 1715 thought deeply about its constitutional implications, passed it overwhelmingly, and thus "carried over" a Founding-era tradition of restricting firearms shipment "into federal statutory law." *Vidal*, 602 U.S. at 304.

**B.     Section 1715 is Supported by Numerous Traditions of Firearms Regulation.**

In determining whether a modern law is consistent with historical tradition, courts evaluate whether the historical precedents supporting the modern law are "relevantly similar"; that is, whether they burden an individual's Second Amendment rights for comparable reasons and in comparable respects. *See Bruen*, 597 U.S. at 28-29 (quotation marks omitted). A contemporary law may be "analogous enough to pass constitutional muster" even where it "does not precisely match its historical precursors"; in other words, the government need not identify a "dead ringer" or "historical twin" to support a modern firearm regulation, so long as the law "comport[s] with the principles underlying the Second Amendment." *See Rahimi*, 602 U.S. at 692; *Bruen*, 597 U.S. at 30.

14

"Why and how the regulation burdens the right [to keep and bear arms] are central to this inquiry." *Rahimi*, 602 U.S. at 680. The Supreme Court has already explained that the purpose of Section 1715 is "to avoid having the post office serve as an instrumentality for the violation of local laws which prohibited the purchase and possession of weapons," and "to make it more difficult for criminals to obtain concealable weapons." *Powell*, 423 U.S. at 91 (citing H.R. Rep. No. 610, 69th Cong., 1st Sess. (1926); 66 Cong. Rec. 726 (1924)). The statute does not "criminalize the mailing of firearms," as plaintiffs assert (*see* ECF No. 25 at 3), but merely requires that handguns be mailed via a federally-licensed dealer, who can ship the weapon safely, verify the recipient's identity, and conduct any background checks required by state or federal law. The statute thus plays an essential role in the longstanding cooperation between state and federal governments in the area of firearms regulation. *See* Deyo Dec. ¶ 6. And while the precise contours to Section 1715 are "by no means identical" to historical precedents, they are sufficiently analogous to survive Second Amendment scrutiny. *See Rahimi*, 602 U.S. at 698.

1.    Section 1715 is integral to the proper functioning of background check and licensing laws.

"Since the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms." *Rahimi*, 602 U.S. at 690. Accordingly, federal, state, and local governments across the country have enacted laws prohibiting certain classes of potentially dangerous persons, such as felons, drug users, persons with major mental health issues, and persons implicated in domestic violence from acquiring firearms. *See, e.g.,* 18 U.S.C. § 922(g); 18 Pa.C.S. § 6105; N.J. Stat. Ann. § 2C:58-3(c); N.J. Stat. Ann. §§ 2C:58-20 to -32; N.J. Stat. Ann. §§ 2C:25-17 to -35; 11 Del. Code § 1448; 11 Del. Code § 1448D(f); N.Y. Penal Law § 265.17; *see also Pitsilides v. Barr,* 128 F.4th 203, 211 (3d Cir. 2025) ("Legislatures historically prohibited possession by categories of persons based on a

15

conclusion that the category as a whole presented an unacceptable risk of danger if armed." (quoting *United States v. Jackson*, 110 F.4th 1120, 1128 (8th Cir. 2024)). As courts in this district have recognized, "[t]he disarming of people who pose a danger to society is deeply rooted in our country's legal traditions." *United States v. Waller,* No. 2:24-cr-90, 2025 WL 3114206, at *8-9 (W.D. Pa. Nov. 7, 2025); *see also United States v. Waulk*, No. 3:20-cr-31, 2024 WL 3937489, at *6-7 (W.D. Pa. Aug. 26, 2024).

Governments have also passed licensing laws and background check requirements to ensure that dangerous persons do not obtain firearms. For example, federal law, as well as the laws of Pennsylvania and the state intervenors require background checks prior to the purchase of weapons to, among other things, ensure that a person in a prohibited category does not obtain a weapon. *See* 18 U.S.C. § 922(t); 18 Pa.C.S. § 6111; N.J. Stat. Ann. § 2C:58-3(a)(3), (b); 11 Del. C. § 1448D(h); N.Y. Gen. Bus. Law § 898. The constitutionality of background check laws is not in doubt, and they have been broadly endorsed. *See, e.g.*, *Bruen*, 597 U.S. at 38 n.9; *see also Range v. Attorney General*, 124 F.4th 218, 282-83 (3d Cir. 2024) (Matey, J., concurring). Likewise, federal courts have treated shall-issue licensing laws aiming to verify that a pistol permit holder is law-abiding and responsible as "presumptively constitutional." *United States v. Peterson*, 161 F.4th 331, 339 (5th Cir. 2025) (quoting *Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211, 216, 227 (4th Cir. 2024) (en banc)); *accord Giambalvo v. Suffolk County*, 155 F.4th 163, 181 (2d Cir. 2025).

Section 1715's longstanding prohibition is integral to the proper functioning of each of the laws above, and the historical traditions that undergird them. As discussed in the accompanying declarations of William Crotty, Eric Barlow, and Michael Deyo, newly unregulated shipping of handguns by mail will suddenly make the Postal Service an "instrumentality for the violation of local laws which prohibited the purchase and possession of weapons," exactly as Congress sought

16

to prevent. *Powell*, 423 U.S. at 91. For instance, opening the mail to handguns would newly allow for weapons to be sent directly to unlicensed persons or persons who could not pass a federal or state background check, resulting in an increased number of prohibited persons obtaining firearms. *See* Barlow Dec. ¶ 24; Crotty Dec. ¶¶ 8, 13-15; Deyo Dec. ¶ 15. It would facilitate the transport of unserialized "ghost guns," which have been a major focus of the state intervenors' civil enforcement efforts. Barlow Dec. ¶ 25; Deyo Dec. ¶ 19; *cf. United States v. Coates*, No. 1:23-CR-0192, 2025 WL 2178416, at *11 (M.D. Pa. July 31, 2025) (finding unserialized weapons outside the Second Amendment's scope). Certain weapons prohibited by the state intervenors' assault weapon laws, such as TEC9 and Uzi-type submachine guns, would become mailable, allowing persons to obtain particularly deadly weapon variants through the mail that they could not obtain at a legitimate local gun store. *See* Barlow Dec. ¶¶ 25-26; Crotty Dec. ¶¶ 17-18; Deyo Dec. ¶ 13; N.J. Stat. Ann. § 2C:391(w); N.Y. Penal Law § 265.00(22)(c). Such a sudden expansion in opportunities for the illicit transfer of guns without federal and state recordkeeping requirements, *e.g.*, 18 U.S.C. § 923(g)(1); N.J. Stat. Ann. § 2C:58-2(b); 24 Del. C. § 904; N.Y. Gen. Bus. Law § 875-f, would also undermine the established national tracing system and create new obstacles for law enforcement to solve violent crimes. *See* Barlow Dec. ¶¶ 37-37; Crotty Dec. ¶¶ 22-35; Deyo Dec. ¶ 17.

More generally, allowing the shipment of handguns by mail would open up a new and powerful opportunity for the trafficking of illegal guns. Because of strong state firearm laws, the overwhelming majority of guns used in crime within the intervenor States come from outside, brought in by straw purchasers or gun traffickers from states with looser laws and less responsible firearm dealers. Barlow Dec. ¶¶ 39-40; Deyo Dec. ¶ 16; *see generally* Bureau of Alcohol, Tobacco, Firearms, and Explosives, *National Firearms Commerce and Trafficking Assessment: Crime Guns*

– *Volume Two*, available at https://perma.cc/6JNT-A69Y. The States have long relied on the existence of the established prohibition on mailing of firearms to prevent such illegal trafficking. Allowing traffickers to send firearms by mail rather than transporting the firearms themselves will only increase the trade in the illegal firearms, the costs to law enforcement, and harms to individuals and families. *See* Deyo Dec. ¶¶ 16, 21; Barlow Dec. ¶¶ 40, 43-45. The Second Amendment does not dictate such an outcome.

       2.       Section 1715 is analogous to Founding-era restrictions on the shipment and distribution of dangerous weapons.

Section 1715 is similarly well-grounded in the Founding-era tradition of regulating the distribution of deadly weapons. During the colonial era and up to the Founding, "colonial governments substantially controlled the firearms trade." *Teixeira v. County of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017), *abrogated in part on other grounds by Bruen*, 597 U.S. at 17. While much of colonial policy focused on "ensuring that the populace was well-armed," the colonies also recognized the dangers inherent in their arms falling into the hands of dangerous persons, and enacted laws restricting the transport or sale of weapons to persons who were perceived of as threatening—or even to law-abiding citizens of other colonies. For example, while Virginia law provided that all persons were at 'liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting *this colony*," that liberty "did not, however, extend to sales to others." *Teixeira*, 873 F.3d at 685 n.18 (quoting 2 William Waller Henig, *The Statutes at Large: Being a Collection of All the Laws of Virginia* 403, TD Ex. 9) (emphasis added). The colonies "also tightly regulated the transportation of both gunpowder and ammunition." *Vereen*, 152 F.4th at 100 (collecting historical sources); *see United States v. Barnes*, Crim. No. 23-12, 2024 WL 33228593, at *4-5 (D. Del. 2024) (surveying colonial regulation of trade in gunpowder).

18

The practice of denying gun and ammunition sales to potential threats continued into the eighteenth century, with New York Governor George Clinton writing to London in 1744 that he had "issued [] Proclamations to forbid the Exportation of Gun powder, or the supplying the French with any kind of provisions, warlike stores, or merchandizes." VI John Broadhead, *Documents Relative to the Colonial History of the State of New-York* 254-55 (1855). And it continued into the early United States, as the Third Congress—which included James Madison, the drafter of the Second Amendment—passed a law declaring that "it shall not be lawful to export from the United States any cannon, muskets, pistols, bayonets, swords, cutlasses, musket balls, lead" and other weapons and ammunition "for and during the term of one year." *An Act Prohibiting for a limited time the Exportation of Arms and Ammunition, and encouraging the Importation of the same*, 3 Cong. ch. 33, 1 Stat. 369 (May 22, 1794), TD Ex. 11.

These statutes are not identical to Section 1715's prohibition on sending firearms in the mail, but they are "relevantly similar" in the way contemplated by the Supreme Court's precedents. *See Rahimi*, 602 U.S. at 692; *Bruen*, 597 U.S. at 29. Specifically, both Section 1715 and the historical analogues restricted the shipment of guns and ammunition in some ways while permitting law-abiding citizens to obtain guns and ammunition locally. And the shared purpose of Section 1715 and the historical analogues was to prevent weapons from being transported to persons who could potentially "pose a threat to the orderly functioning of society." *Waulk*, No. 20-cr-31-1, 2024 WL 3937489, at *7 (W.D. Pa. Aug. 26, 2024) (recognizing tradition of preventing dangerous persons from accessing firearms "to protect the public from the violence and disorder" posed by such individuals.). These similarities are amply sufficient to uphold the constitutionality of Section 1715.

19

IV.    **SECTION 1715 IS A LAWFUL EXERCISE OF CONGRESS'S POSTAL POWERS**

It is axiomatic that the Constitution vests Congress with broad authority over the U.S. postal system. U.S. Const. art. I, § 8. That authority, the Supreme Court has explained, "has been practically construed, since the foundation of the government, to authorize . . . all measures necessary to secure [the mail's] safe and speedy transit," which has included "legislation prescribing what should be carried." *Ex parte Jackson*, 96 U.S. 727, 732 (1877); *see, e.g.*, *United States v. Barry*, 888 F.2d 1092, 1095 (6th Cir. 1989) ("The Constitution grants Congress plenary authority over the postal system."); *Pakas v. United States*, 240 F. 350, 353 (2d Cir. 1917) (same). Thus, "Congress has long provided that specified items are 'non-mailable,' including alcohol, *firearms*, poisons, inflammable materials, etc." *Musser's Inc. v. United States*, 1 F. Supp. 3d 308, 319 (E.D. Pa. 2014) (emphasis added) (citing 18 U.S.C. §§ 1715-1717). That is because "[t]he right to designate what shall be carried necessarily involves the right to determine what shall be excluded." *Ex parte Jackson*, 96 U.S. at 732.

Section 1715's longstanding prohibition on mailing of firearms is a paradigmatic exercise of that authority. *See Gordon v. Holder*, 826 F. Supp. 2d 279, 285-87 (D.D.C. 2011), *aff'd* 721 F.3d 638 (D.C. Cir. 2013). Indeed, courts have repeatedly cited Section 1715 to illustrate Congress's general authority over the postal system. *See, e.g., Musser's Inc.*, 1 F. Supp. 3d at 319; *Gordon*, 826 F. Supp. 2d at 287. And as the Supreme Court has confirmed, Congress enacted Section 1715 to combat the criminal circumvention of state and local laws regulating the distribution of firearms and "to make it more difficult for criminals to obtain concealable weapons." *Powell*, 423 U.S. at 91.

Plaintiffs make no mention of Congress's broad authority in this area. And the OLC Memorandum merely observes in passing that courts have recognized that regulations of the postal

20

service may implicate the First and Fourth Amendments. *See* ECF No. 27-1 at 4-5. Those holdings, however, are inapposite. Courts have reasoned, for example, that "restrictions upon the mail system implicate the First Amendment" because "'the use of the mails is almost as much a part of free speech as the right to use our tongues.'" *Currier v. Potter*, 379 F.3d 716, 727 (9th Cir. 2004) (quoting *Blount v. Rizzi*, 400 U.S. 410, 416 (1971)). But that reasoning is simply inapplicable here because Congress's regulation of the transfer of firearms via the Postal Service is, at most, ancillary to the Second Amendment right to keep and bear arms. *See supra* Section II. The Supreme Court has also explained that the Fourth Amendment right against unreasonable searches and seizures extends to an individual's papers and sealed packages transported through the mail. *See Ex parte Jackson*, 96 U.S. at 733. But that Fourth Amendment limitation is similarly inapposite because it does not implicate the core of Congress's authority to deem certain items non-mailable.[2]

Of course, Congress may not use its postal power to functionally prevent the public from accessing constitutionally protected material or as an excuse to violate the core of constitutional rights. However, Section 1715 does not prevent persons from owning, carrying, or even mailing handguns; it merely requires that they do so through a licensed manufacturer or distributor, who can verify that both sender and recipient are legitimate, and ensure that the firearm is shipped in a safe and responsible way. Such limits are fully consistent with Congress's historical power to make determinations about mailability.

## V.      THE GOVERNMENT AS A BUSINESS PROPRIETOR CAN REFUSE TO SHIP HANDGUNS

---

[2] To be sure, the fact that Section 1715 is a proper use of Congress's authority over the mails in no way indicates that every mailability determination made by Congress is necessarily lawful. *See, e.g.*, *Youngs Rubber Corp. v. C. I. Lee & Co.*, 45 F.2d 103, 108 (2d Cir. 1930) (rejecting mailability restriction on medical devices as impermissibly boundless). But the mere possibly of legal challenges to other mailability restrictions in no way makes Section 1715 an improper use of Congress's authority.

Lastly, Section 1715 is constitutional because it does not directly regulate gun rights, but instead merely places conditions on the services that the Postal Service provides as a proprietor when selling services to the public. Courts have "'long held the view that there is a crucial difference, with respect to constitutional analysis, between the government exercising the power to regulate or license, as lawmaker, and the government acting as proprietor, to manage its internal operation.'" *Kipke v. Moore,* 165 F.4th 194, 208 (4th Cir. 2026) (quoting *Engquist v. Or. Dep't of Ag.*, 553 U.S. 591, 598 (2008)). That principle applies with full force to the Postal Service, as recognized by the Supreme Court in *United States v. Kokinda*, 497 U.S. 720, 725 (1990). And it implies with full force in the Second Amendment context, as three Circuits have recognized. *See Kipke*, 165 F.4th at 209.

The nature of Section 1715 as a proprietary measure rather than a regulatory one is demonstrated by the scope of the conduct the law touches. "[T]he contrast between the regulation challenged here and the bans struck down in *Heller* and *McDonald* is stark. Those bans regulated wholly private activity and applied directly to every citizen in the respective jurisdictions." *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1126-27 (10th Cir. 2015) (upholding postal regulation against pre-*Bruen* Second Amendment challenge). By contrast, Section 1715 applies only to the carrying of the mail by the Postal Service itself; it does not apply to private carriers, and accordingly it "affects private citizens only insofar as they are doing business with the [Postal Service] [.]" *Id.* at 1127.

To be sure, "[t]he Government, even when acting in its proprietary capacity, does not enjoy absolute freedom from [constitutional] constraints, as does a private business, but its action is valid in the circumstances unless it is unreasonable, or 'arbitrary, capricious, or invidious.'" *Kokinda*,

22

407 U.S. at 725-26 (quotation and citation omitted).[3] Section 1715 comfortably passes muster under this governing standard. As previously discussed, "the regulation is directly relevant to the USPS's business objectives, which include providing a safe environment for its patrons and employees." *Bonidy*, 790 F.3d at 1127. And because it advances Congress' purpose "to avoid having the Post Office serve as an instrumentality for the violation of local laws," *Powell*, 423 U.S. at 91, without restricting other, private means of transport, it is a "'reasonable legislative objective[] advanced by the [government] in a proprietary capacity.'" *Pittsburgh Lg. of Young Voters Educ. Fund v. Port Auth. of Allegheney Cty.*, No. 06 Civ. 1064, 2008 WL 4965855, at *26 (W.D. Pa. Aug. 14, 2008) (quoting *Lehman v. City of Shaker Hts.*, 418 U.S. 298, 304 (1974)).

## **<u>CONCLUSION</u>**

For the reasons set forth above, the state intervenors respectfully request that the Court deny plaintiffs' motion for summary judgment, grant the federal defendants' and state intervenors' cross-motions for summary judgment, dismiss the complaint in its entirety and with prejudice, and grant such other and further relief as it deems just and proper.

---

[3] While *Kokinda* is a First Amendment case, it is "proper to import this reasoning from the First to the Second Amendment here." *Kipke*, 165 F.4th at 209.

23

Dated: March 2, 2026                           Respectfully Submitted,


**KATHLEEN JENNINGS**                          **JENNIFER DAVENPORT**
Attorney General of Delaware                    Attorney General of New Jersey

By: */s/Ian R. Liston*                          By: */s/ Meghan K. Musso*
Ian R. Liston*                                  Meghan K. Musso*
Jennifer Kate Aaronson*                         Deputy Attorney General
Deputy Attorneys General                        124 Halsey Street, 5th Floor
Delaware Department of Justice                   Newark, New Jersey 07101
820 N. French Street                            (609) 696-5276
Wilmington, DE 19801                            Meghan.musso@law.njoag.gov
(302) 683-8875
ian.liston@delaware.gov                         *Counsel for the State of New Jersey*
jennifer.aaronson@delaware.gov


*Counsel for the State of Delaware*


**LETITIA JAMES**
Attorney General of the State of New York

By: */s/ James Thompson*
James M. Thompson*
Special Counsel for Second Amendment Litigation
Molly Thomas-Jensen*
Special Counsel
Danny Yao Li**
Assistant Solicitor General
28 Liberty St.
New York, New York 10005
(212) 416-8679
james.thompson@ag.ny.gov
molly.thomas-jensen@ag.ny.gov
danny.li@ag.ny.gov

*Counsel for the State of New York*

* Admitted *pro hac vice*
** *Pro hac vice* application pending